522 So.2d 1110 (1988)
STATE of Louisiana
v.
Eric BROWN.
No. 87 KA 0833.
Court of Appeal of Louisiana, First Circuit.
February 23, 1988.
*1111 Bryan Bush, Dist. Atty., Baton Rouge by Jesse Bankston, Asst. Dist. Atty., for plaintiff/appellee.
Orscini Beard, Baton Rouge, Office of the Public Defender (for appeal), for defendant/appellant.
Before COVINGTON, C.J., and SAVOIE and LEBLANC, JJ.
SAVOIE, Judge.
Eric Brown (defendant) was indicted for second degree murder, a violation of LSA-R.S. 14:30.1, in connection with the shooting death of Gregory Daniels. Defendant elected to be tried by a jury, which convicted him as charged; he was subsequently sentenced to the mandatory term of life imprisonment at hard labor, without benefit of probation, parole or suspension of sentence. He has appealed, urging twenty-seven assignments of error and briefing thirteen. Assignments of error not briefed are considered abandoned. Uniform Rules Courts of Appeal, Rule 2-12.4.
The record reflects that Gregory Daniels (the victim in this case) had been charged by grand jury indictment during September of 1985 with manslaughter for killing Anthony Brown, defendant's brother. Daniels pled guilty as charged and received a probationary sentence. The record further reflects that the instant offense occurred on April 16, 1986, at about 10:30-11:00 p.m., on a street corner across from the Rosenwald Apartments in Baton Rouge. Anthony Davis, Carlwynn Turner, and Patrick A. Davis were standing near a tree with Daniels at the time he was shot. Following an autopsy, it was determined that *1112 Daniels died from a single shotgun wound to his left neck area.
Anthony Davis testified that, at about 9:00-9:30 p.m., while he was with Gregory Daniels, Kelvin Brown (defendant's brother) approached them on his bicycle. A conversation concerning the killing of Anthony Brown ensued. Anthony Davis testified that the conversation was "pretty heated" and that Kelvin Brown pulled a gun. Carlwynn Turner testified that Kelvin Brown "called out" to Gregory Daniels to "come over to where he was" but that Daniels did not. Kelvin Brown rode away on his bicycle.
According to the testimony of Anthony Davis and Carlwynn Turner, they then walked with Daniels to his apartment before they walked to a store. Upon their return from the store, Daniels walked out of his apartment, rejoined them, and walked down the street with them to the street corner where they stood with Patrick Davis near a tree. They began drinking immediately before the shooting occurred.
Anthony Davis testified that they observed someone coming down the street but paid no attention to the person, and shortly thereafter they heard the "blast." Anthony Davis testified that he was facing Daniels, who was about six feet away from him at the time, and that the shot originated from behind him. Anthony Davis further testified that he was "transfixed on Greg [Gregory Daniels] falling on the ground." He ran to Daniels, bent down and looked up only to see a black male, whom he could not identify, running away and rounding the corner. As the individual turned the corner, Davis could see a sawed-off gun, about eighteen to twenty-five inches long, flashing under the street lights.
Carlwynn Turner testified that he, Anthony Davis, Patrick Davis, and Gregory Daniels were standing and drinking when someone approached and "called out" to Daniels, telling him he had some "weed." Daniels distanced himself a "few feet" from his companions; the approaching individual said: "I got you now." He then fired one shot. Turner testified that he was positive that the perpetrator was defendant. Turner testified that he was about four or five feet from Daniels and about nine or ten feet from defendant when defendant shot Daniels. He further testified that he initially recognized defendant at the time defendant "called out" to Daniels. Turner testified that his identification of defendant was based upon his having "glimpsed" defendant and recognizing defendant's height. He also paid particular attention to the perpetrator after Daniels was shot because of threats that had been made against Daniels regarding the killing of Anthony Brown. Turner further testified that he did not see Daniels do anything before the shooting to provoke defendant and that defendant ran after firing upon Daniels.
Patrick A. Davis testified as a defense witness. He stated that he was present at the time of the offense but that he did not see who committed the crime.
Ike David Folse[1] testified that, on the date in question, he met defendant at about "dusk/dark" at "The Hole" on Rosewood Street. Kelvin Brown came there and told defendant he knew where Gregory Daniels was; defendant said: "[L]et's go." Defendant asked Folse to give him a ride in his car. Defendant had a sawed-off shotgun with him. With defendant riding as a front seat passenger and Kelvin Brown in the rear seat, Folse drove to the Rosenwald Apartments. After they left there, they continued looking for Daniels. At some time thereafter, defendant saw Daniels walking. Folse apparently stopped his car, and defendant exited the car and began walking behind Daniels. Folse testified that before defendant did so he said that he was going to kill Daniels. Although Folse did not see the actual shooting, he heard a single gunshot. About a minute later he saw defendant running back to his car with *1113 the sawed-off shotgun in his hands. Defendant told Folse he "got him for his brother" and to drive away. Folse complied and drove his car to a club in Zachary.
Joseph Pate, who lives with defendant's sister, Michel Brown, testified that defendant told him he killed Daniels because Daniels had killed his brother. According to Pate, defendant made the foregoing statement about two or three weeks after Daniels' death while he and defendant were sitting together, talking and drinking at defendant's home. Defendant made the statement on several occasions. Defendant also would laugh and say, "I'm just kidding."
The defense countered Joseph Pate's testimony with that of David Price, an attorney employed by the Office of Public Defender. Price testified that he had represented defendant, apparently in regard to this matter. Price testified that Pate telephoned him at home on August 7, 1986. At that time, Pate told Price that defendant told him that he had killed an unnamed person.
ASSIGNMENTS OF ERROR NOS. ONE, TWO, FOUR AND FIVE:
By means of these assignments, defendant contends that the trial court erred by allowing the state to use peremptory challenges to exclude prospective jurors of defendant's race from serving on the jury solely on the basis of their race. He argues that the state's use of those peremptory challenges is contrary to LSA-C.Cr.P. art. 795 and Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Defendant also argues that he was denied his right to equal protection under the Fourteenth Amendment to the United States Constitution and his right to a jury trial by his peers.
A peremptory challenge by the state shall not be based solely upon the race of the juror. LSA-C.Cr.P. art. 795(B). In Batson, supra, the United States Supreme Court held that the Equal Protection Clause forbids the state from using its peremptory challenges to strike potential jurors of the defendant's race solely on account of their race or the assumption that jurors of the defendant's race will be unable to impartially consider the state's case against the defendant.
In Batson, supra, the United States Supreme Court held that a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. In regard to the establishment of such a prima facie case, the Supreme Court stated the following:
To establish such a case, the defendant first must show that he is a member of a cognizable racial group, Castaneda v. Partida, supra, 430 U.S. [482], at 494, 97 S.Ct. [1272], at 1280 [51 L.Ed.2d 498 (1977)] and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits `those to discriminate who are of a mind to discriminate.' Avery v. Georgia, supra, 345 U.S. [559], at 562, 73 S.Ct. [891], at 892 [97 L.Ed.2d 1244 (1953)]. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empanelling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination.
In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances. For example, a `pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative. We have confidence that trial judges, experienced in supervising voir *1114 dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors.
Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors.... The trial court then will have the duty to determine if the defendant has established purposeful discrimination.21
21 In a recent Title VII sex discrimination case, we stated that `a finding of intentional discrimination is a finding of fact' entitled to appropriate deference by a reviewing court. Anderson v. Bessemer City, 470 U.S. [564], 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference. Id., at 575-576, 105 S.Ct., at 1512.
476 U.S. at 96-98, 106 S.Ct. at 1723-1724.
The record reflects that, immediately following voir dire examination of the initial panel of twelve prospective jurors, the state peremptorily challenged Ms. Orlando Hall and Mr. Mark Banks, both of whom are of the black race, as is defendant. Defense counsel used peremptory challenges to exclude four other prospective jurors on the panel. Immediately before the remaining six prospective jurors (which included one member of the black race) were sworn and seated as jurors in this case and out of their and the other prospective jurors' presence, defense counsel objected to the state's peremptory challenges of Ms. Hall and Mr. Banks as contrary to Batson, supra. The trial court concluded that defendant had established a prima facie case under Batson, requiring the prosecutor to come forward with neutral explanations for challenging Ms. Hall and Mr. Banks. Thereupon, the prosecutor stated his explanations for peremptorily challenging Ms. Hall and Mr. Banks, and the trial court ruled that it would allow the state's peremptory challenges of Ms. Hall and Mr. Banks on the basis that the state's explanations for the challenges showed they were exercised on grounds other than race. Voir dire resumed; thereafter, the state was allowed by the trial court to utilize three additional peremptory challenges to exclude black prospective jurors Ms. Willie Mae Ford, Mr. Errol Combest, and Ms. Anita Donald on the basis of the state's explanations for those challenges.[2]
The reasons given by the prosecutor for peremptorily challenging the five black prospective jurors were as follows: (1) In the prosecutor's view, Mr. Banks gave misleading answers in response to questions posed by the prosecutor (indicated as the primary reason). He is single, and the prosecutor prefers married and stable persons. Given as an additional reason for excluding Mr. Banks was his father's occupation as a minister. (2) Ms. Hall was excluded primarily because, during voir dire examination of the other prospective jurors, she began reading from a book, which caused the prosecutor to become concerned that she might not be able to maintain an interest in the case during the trial. Additionally, she resides with her parents and is single. The prosecutor also noted that the fact that Ms. Hall had been laid off by four different employers shed doubt upon her credibility in his view. (3) Ms. Ford was excused because she served on a jury in a trial presented by the district attorney of the Nineteenth Judicial District within the past three months. She voted not guilty in the case, in which an eleven to one verdict was reached in favor of the state. (4) Mr. Combest was challenged because of his knowledge about the defense counsel and his friendship with clients of the defense counsel. Mr. Combest also indicated he had spoken to his friends about this case and the defense counsel, although all potential jurors had been admonished by the trial court not to discuss the case. (5) Ms. Donald was challenged because of her strong religious experiences and due to the fact that at age twenty-five she continues to live in the protected environment of the *1115 family home. The prosecutor noted that he would prefer a juror with a more normal contact with the society of work and self-support.
After careful review of the entire voir dire proceedings, we conclude that the five black prospective jurors peremptorily challenged by the state were challenged on the basis of justifiable reasons totally unrelated to race. Additionally, the record shows that three members of the twelve person jury in this case were black and that the state had unused peremptory challenges available[3] to exclude those blacks had discrimination been its intention. See State v. Brown, 507 So.2d 304 (La.App. 3rd Cir.1987). Hence, defendant failed to establish that there was purposeful discrimination in this case.
These assignments lack merit.
ASSIGNMENT OF ERROR NO. SIX:
By means of this assignment, defendant contends that the trial court erred by denying his challenge for cause of prospective juror Ms. Clara Danenhower. Defendant asserts that the prospective juror admitted that she would not feel comfortable on the jury in this case. Citing LSA-C. Cr.P. art. 797(2), defendant argues that the prospective juror should have been excused for cause on the basis that she was not impartial "toward the proceedings as a whole."
During voir dire, Danenhower stated that she had previously served on a jury in a second degree murder case four or five years ago, in which the accused was found guilty. Danenhower was asked whether or not she would be able to disregard anything she might have learned in the prior case regarding the murder statute and follow the trial court's instructions concerning the current law in this case, and she responded in the affirmative. She was then asked whether or not there was any reason that she did not want to serve on the jury in this case. She responded that she did not want to serve in this case because she did not like serving on the jury in the prior case. She described her previous jury experience as an upsetting experience for her and stated that one year later the verdict was set aside and the accused was set free. She stated that she had no other reason for not wanting to serve as a juror and that she had no beliefs, religious or otherwise, that would cause her difficulty in passing upon a person's guilt or innocence. Upon further questioning, Danenhower stated that she would be able to sit in the instant case but that she would not be happy in doing so. Thereafter, however, she stated that her unhappiness would not affect her in terms of listening to the evidence, that she would be able to render a fair and honest decision, that she did not have any problems sitting as a juror in this case, that she understood the state's burden of proof, that she could "wipe out" the prior trial in which she sat as a juror and decide this case based on the evidence and that she could be fair and honest with defendant.
We find that the tenor of Danenhower's responses to questioning during voir dire show that, although she would have preferred not to be on the jury, she felt that if she was chosen she could be fair and impartial and that she could follow the trial court's instructions. Since defendant did not show that the juror would not be impartial, the trial court did not err in denying the challenge for cause. See LSA-C.Cr.P. art. 797(2); State v. Baylis, 388 So.2d 713 (La.1980).
This assignment lacks merit.
ASSIGNMENT OF ERROR NO. ELEVEN:
By means of this assignment, defendant contends that the trial court erred by allowing the state to adduce Joseph Pate's testimony regarding defendant's confession to Pate. He asserts that his confession was not free and voluntary because of his alleged intoxication.
Before a confession can be introduced into evidence, the state has the burden of affirmatively proving that it was *1116 free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. LSA-R.S. 15:451; State v. Mitchell, 437 So.2d 264 (La.1983). Where the free and voluntary nature of a confession is challenged on the ground that the defendant was intoxicated at the time of confession, the confession will be rendered inadmissible only when the intoxication is of such a degree as to negate defendant's comprehension and to render him unconscious of the consequences of what he is saying. State v. Meredith, 400 So.2d 580 (La.1981). Whether intoxication exists and is of a degree sufficient to vitiate the voluntariness of the confession are questions of fact, and a trial judge's conclusions on this issue will not be disturbed unless unsupported by the evidence. State v. Rankin, 357 So.2d 803 (La.1978).
In order to lay the requisite foundation for the admission of defendant's confession into evidence, the jury was retired from the courtroom, at which time the state presented the testimony of Joseph Pate. Pate testified that defendant made his confession while the two were talking together at defendant's home. At the time, they were "high" from drinking (presumably alcoholic beverages) and smoking marijuana. Pate testified that they were also "shooting coke" that day. However, Pate further testified that defendant appeared to understand what he was saying, that he and defendant had a "normal-type of conversation", that he did nothing to force defendant to make the statement and that he did not threaten defendant into making the statement.
Pate's uncontradicted testimony established that defendant spontaneously confessed to Pate, who lived with defendant's sister, and that the confession was freely and voluntarily made. Accordingly, the trial court properly allowed the state to introduce the confession into evidence through Pate's testimony.
This assignment lacks merit.
ASSIGNMENTS OF ERROR NOS. THIRTEEN AND FOURTEEN:
By means of these assignments, defendant contends that the trial court erred by sustaining the state's objection to defense counsel's questioning of a witness.
The record shows that defendant called Ernest A. Smithling[4] as his witness. On direct examination, defense counsel began questioning Smithling in regard to his prosecution of Gregory Daniels for the manslaughter of Anthony Brown. In reference to the questioning to which assignment thirteen relates, defense counsel asked Smithling "what actually happened" in the case he had prosecuted against Gregory Daniels. The prosecutor objected to the defense counsel's question on the basis that Smithling had testified that he was not a witness to the crime and that the question improperly called for Smithling's testimony as to what other persons had told him and what he had read concerning the incident. The trial court sustained the state's objection, and defense counsel did not object to the ruling. During further questioning to which assignment fourteen relates, the following exchange occurred:
Q How did you present the case to the Grand Jury? Did you initially present it as a manslaughter case?
MR. BANKSTON: Your Honor, I'm going to object to this. He is asking for testimony about Grand Jury proceedings, which are secret.
MR. BEARD: I am not, Your Honor. I'm asking how he presented the case to the Grand Jury.
THE COURT: I sustain the objection. It's irrelevant.
Again, defense counsel failed to object to the court's ruling sustaining the state's objection.
When defense counsel fails to make a contemporaneous objection to a ruling sustaining the state's objection to defense questioning, such failure is deemed to constitute acquiescence in the ruling and the *1117 alleged error is not preserved for review on appeal. See State v. Huizar, 414 So.2d 741 (La.1982); State v. Brown, 504 So.2d 1086 (La.App. 1st Cir.1987). Herein, defense counsel's failure to object to the trial court rulings prevents defendant from raising the alleged erroneous rulings on appeal.
In any event, in reference to the questioning to which assignment thirteen relates, defense counsel made clear to the trial court that the purpose of his questioning was to elicit Smithling's testimony as to the facts of the offense for which he had prosecuted the victim. LSA-R.S. 15:463, however, provides that a witness can testify only as to facts within his knowledge and not as to any recital of facts heard by him. Smithling's testimony at the trial showed that he was not a witness to the offense upon which his prosecution of the victim was based. Accordingly, the trial court properly disallowed defense counsel's questioning which was designed to elicit testimony regarding facts pertaining to a crime Smithling had gained knowledge of only by virtue of his prosecution of the offense. Furthermore, in reference to the questioning to which assignment fourteen relates, the trial court did not abuse its discretion in disallowing the questioning on relevancy grounds. Relevant evidence is that tending to show the commission of the offense and the intent, or tending to negative the commission of the offense and the intent. LSA-R.S. 15:441. In questions of relevancy, much discretion is vested in the trial judge; his rulings will not be disturbed on appeal in the absence of a showing of an abuse of discretion. State v. Hawkins, 496 So.2d 643 (La.App. 1st Cir. 1986), writ denied, 500 So.2d 420 (La.1987).
These assignments lack merit.
ASSIGNMENT OF ERROR NOS. SEVENTEEN AND EIGHTEEN:
By means of these assignments, defendant contends that the trial court erred by sustaining the state's objection to defense counsel's motion that he be permitted to introduce evidence as to the victim's character. Citing LSA-R.S. 15:482, defendant argues that evidence pertaining to the victim's character was admissible in support of a plea of self-defense to show the accused's reasonable apprehension of danger and to help determine who was the aggressor.
The record reflects that during defense counsel's presentation of defendant's case, after the jury was first removed from the courtroom, defense counsel made a motion that he be allowed to introduce evidence of the victim's character. The state objected to the motion on the basis that defense counsel had not laid the requisite foundation provided for in LSA-R.S. 15:482 for admission of such evidence; in sustaining the state's objection on that basis, the trial court ruled that evidence of the victim's character was inadmissible. The defense counsel objected to the ruling.
LSA-R.S. 15:482 provides as follows:
In the absence of evidence of hostile demonstration or of overt act on the part of the person slain or injured, evidence of his dangerous character or of his threats against accused is not admissible.
The jurisprudence has interpreted LSA-R.S. 15:482 to mean that evidence of the dangerous character of the victim is admissible only if the accused first produces evidence that the victim engaged in a hostile demonstration or an overt act against the accused at the time of the incident, of such character as to create in the mind of a reasonable person the belief that he is in immediate danger of losing his life or suffering great bodily harm. See State v. Williams, 410 So.2d 217, 221 (La.1982); State v. Burton, 464 So.2d 421 (La.App. 1st Cir.), writ denied, 468 So.2d 570 (La.1985). In State v. Lee, 331 So.2d 455 (La.1975), the Supreme Court held that, once an overt act is established, evidence of the victim's dangerous character or of his threats against the accused is admissible in support of a plea of self-defense for two distinct purposes: (1) to show defendant's reasonable apprehension of danger which would justify his conduct, and (2) to help determine who was the aggressor in the conflict.
For the reasons set forth below, we are in agreement with the trial court's rulings that the proper predicate had not been laid for the introduction of any evidence of the *1118 victim's dangerous character or threats against the accused and that, for that reason, such evidence was inadmissible. There was no evidence in this case showing that the victim engaged in a hostile demonstration or an overt act against the accused at the time of the incident. To the contrary, Carlwynn Turner testified that before the shooting he did not see the victim do anything to provoke defendant.
These assignments lack merit.
ASSIGNMENT OF ERROR NO. TWENTY-FIVE:
By means of this assignment, defendant contends that the trial court erred by denying his motion for new trial.
In part, this assignment is based upon the same contentions relied upon in reference to assignments one, two, four and five, i.e., the state's use of peremptory challenges to exclude prospective black jurors. Because we previously found those contentions meritless, we need not address them.
Defendant's remaining contention, raised through this assignment, is that the trial court erred by failing to grant him a new trial because a witness he subpoenaed for trial did not appear and testify. In support thereof, defendant cites LSA-C.Cr.P. art. 851(3).
LSA-C.Cr.P. art. 851 provides, in pertinent part:
The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever:
. . . .
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty[.]
In a motion for new trial based upon the discovery of new and material evidence, the burden is on the defendant to show that the new evidence was not discoverable prior to or during trial and that, if the evidence had been introduced at trial, the new evidence probably would have caused the trier of fact to reach a different verdict. State v. Clayton, 427 So.2d 827 (La.1983) (on rehearing). In evaluating whether the newly discovered evidence warrants a new trial, the test to be employed is not simply whether another jury might bring in a different verdict, but whether the new evidence is so material that it ought to produce a verdict different from that rendered at trial. State v. Spears, 504 So.2d 974 (La.App. 1st Cir.), writ denied, 507 So.2d 225 (La.1987). Furthermore, the trial court's denial of a motion for new trial will not be disturbed absent a clear abuse of discretion. State v. Buchanan, 439 So.2d 576 (La.App. 1st Cir. 1983).
In this case, defendant has failed to show that the witness' testimony constituted new evidence not discoverable prior to or during trial and that, if the evidence had been introduced at trial, it probably would have caused the trier of fact to reach a different result.
This assignment lacks merit.
ASSIGNMENT OF ERROR NO. TWENTY-SIX:
By means of this assignment, defendant contends that the trial court erred by denying his motion for post verdict judgment of acquittal. Defendant essentially argues that the state failed to prove all the essential elements of second degree murder based upon the questionable credibility of the state's witnesses and inconsistencies in their testimony.
Initially, we note that it is not the function of an appellate court to assess credibility or reweigh the evidence. Appellate review for minimal constitutional sufficiency of evidence is a limited one restricted by the standard developed in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). State v. Rosiere, 488 So.2d 965 (La.1986).
*1119 The constitutional standard for testing the sufficiency of evidence, enunciated in Jackson v. Virginia, requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime charged beyond a reasonable doubt. See LSA-C.Cr.P. art. 821. When circumstantial evidence is used to prove the commission of the offense, LSA-R.S. 15:438 mandates that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." This is not a purely separate test from the Jackson sufficiency standard to be applied instead of a sufficiency of the evidence test whenever circumstantial evidence forms the basis of the conviction. Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. Due process requires no greater burden. State v. Rosiere, supra; State v. Garcia, 483 So.2d 953 (La.1986).
Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. LSA-R.S. 14:30.1. Viewing the evidence in the case in the light most favorable to the prosecution, any rational trier of fact could have found that all the essential elements of second degree murder were proved beyond any reasonable doubt and to the exclusion of every reasonable hypothesis of innocence. The evidence showed that, while armed with a sawed-off shotgun, defendant approached the victim and fired a single shot which killed him and that the victim did nothing to provoke the shooting.
This assignment lacks merit.
ASSIGNMENT OF ERROR NO. TWENTY-SEVEN:
By means of this assignment, defendant contends that the trial court erred by imposing an excessive sentence and failing to comply with the sentencing guidelines contained in LSA-C.Cr.P. art. 894.1. Defendant argues that because he was twenty-two years old at the time of sentencing a lighter sentence would not deprecate the seriousness of the offense and that the "record tends to indicate a hostile demonstration on the victim's part." He further notes that the victim killed his brother.
Contrary to defendant's assertion, the evidence introduced at trial failed to show that the victim did anything to provoke the offense. The trial court sentenced defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence, the mandatory sentence provided in LSA-R.S. 14:30.1. Hence, the court neither imposed an excessive sentence nor did it err by failing to articulate reasons for the sentence.[5]
This assignment lacks merit.
For these reasons, the conviction and sentence of the defendant are affirmed.
AFFIRM CONVICTION AND SENTENCE.
NOTES
[1] The record reflects that an agreement was entered into between the state and Ike David Folse that in return for his testimony he would not be prosecuted for "any involvement and events leading to the death of Gregory Daniels." Additionally, the state specifically granted Folse derivative use and transactional immunity with respect to the circumstances of Daniels' death.
[2] The record reflects that instead of giving oral reasons for peremptorily challenging Mr. Ford, Mr. Combert and Ms. Donald (as had been done in regard to Ms. Hall and Mr. Banks) written reasons were given which the trial court ordered filed into the record.
[3] The record shows that the state utilized only six of its twelve peremptory challenges. Of those six challenges, five were those previously discussed. One peremptory challenge was exercised against a white juror.
[4] Smithling had earlier testified for the state during the state's presentation of its case-in-chief.
[5] We note that defendant does not allege, nor are we aware of, any factor in support of a finding that his sentence is disproportionate to the criminal conduct exhibited in this case. Nor does he allege any valid basis upon which his sentence is excessive under the particular circumstances of this case. See State v. Foley, 456 So.2d 979 (La.1984); State v. Payne, 482 So.2d 178 (La.App. 4th Cir.), writ denied, 487 So.2d 436 (La.1986). State v. Hookfin, 476 So. 2d 481, 494 (La.App. 1st Cir.1985).