HIGGINBOTHAM, J.
The defendant, Erik Mollerberg, was charged by bill of information with one count of simple criminal damage to property, a violation of La. R.S. 14:56 ; and one count of aggravated assault with a firearm, a violation of La. R.S. 14:37.4. He pled not guilty to the charges and waived his right to a jury trial. Following a bench trial, he was adjudicated guilty on both counts. The *602 defendant filed a motion for new trial, which was denied. On each count, the defendant was sentenced to one-and-one-half years imprisonment at hard labor. The sentences were ordered to run concurrently. The trial court permitted the sentencing to be served via home incarceration, supervised and monitored through the Department of Corrections. The defendant was also ordered to make restitution to the victim in the amount of $1,500, and to pay court costs and supervision fees. The defendant now appeals, designating four assignments of error concerning his conviction for aggravated assault with a firearm. The defendant does not contest the simple criminal damage to property conviction.
FACTS
On May 8, 2016, Mother's Day, college student Calob Leindecker was driving home from college to his parents' house in Prairieville, Louisiana. Calob turned off of Old Jefferson Highway onto Oakland Drive, the street at the front of his parents' neighborhood. The first house to Calob's right was the defendant's house. Calob decided that he wanted an energy drink, so he turned into the defendant's side driveway and immediately turned his car around the other way to head to a gas station. There was an automatic sliding iron gate across the length of the defendant's driveway. As Calob was backing out of the driveway, the defendant's young son ran to the gate with his arms spread and was apparently telling Calob to leave.
As Calob drove toward the stop sign at the front of the neighborhood, he saw the defendant in his yard, following him and making gestures. Calob could tell the defendant was upset, so he backed up his car and stopped near the defendant's side driveway. He rolled down his window to talk to the defendant to find out what was wrong, but the defendant went inside. According to Calob, the defendant's wife, Shannon, who was near the back of the house by the swimming pool, began yelling and cursing at Calob. Since Calob was unable to speak to anyone, he drove on to the gas station. As Calob drove away, the defendant ran down the length of his driveway with an AR-15 rifle and then walked with the rifle back toward the house.
About five minutes later, the defendant's stepdaughter returned home and parked her vehicle on the side driveway so as to block the gate; she opened the iron gate and left it open. As three of the defendant's young children stood in the driveway near the gate, the defendant walked back onto the driveway, looking in the direction of where Calob had driven. Several seconds later, Calob returned from the gas station to head toward his parents' house. As Calob passed the defendant's house, the defendant walked down his driveway toward the street while loading the AR-15 rifle. The magazine fell out of the rifle, and the defendant picked it up and inserted it back into the rifle. At the same time, he flagged down Calob, and Calob stopped. The defendant walked from his driveway onto the street toward Calob's vehicle. The defendant was very upset with Calob. After a few seconds, Calob began to drive off, and the defendant jabbed the muzzle of his rifle into the passenger side door of Calob's vehicle, at which time, Calob hit his brakes. The defendant approached the passenger side window and pointed his AR-15 rifle at Calob. Calob then sped away. When Calob arrived at his parents' house and told them what happened, his mother called the police. The defendant was arrested. The entire incident was captured on the defendant's surveillance cameras outside of his house. There was no audio on the surveillance tapes.
*603 The defendant's wife, Shannon, testified at trial that the family was celebrating Mother's Day by their pool, when Calob pulled into the driveway. According to Shannon, her son walked toward Calob and asked him to "please" not use their driveway. Her son then told his parents that Calob would not leave, and that is when the defendant walked out to tell Calob to leave. Calob pulled out, drove off, then put his car in reverse and came back. It was at this point that Shannon and Calob exchanged words. According to Shannon, Calob was yelling something about her "kids should not be going out there and telling him to leave." Shannon told Calob that he was trespassing and asked him to please leave or she would call the police. The defendant then came out with the gun. Shannon testified that she was scared and her children were very scared.
The defendant testified at trial that he had a simple burglary conviction in 2003, but he had been pardoned for that crime. According to the defendant, his son went to tell Calob to leave when he pulled in the driveway, and his son returned to inform him that Calob would not leave. The defendant walked through his breezeway toward Calob and yelled at him that he needed to go. Calob rolled down his window and said, "I don't have to go anywhere." The defendant went back inside, while Calob backed up his car and exchanged words with his wife, Shannon. The defendant then came outside with his AR-15 rifle and, according to the defendant, once Calob saw the rifle, he took off. Later, when Calob drove back down the street, the defendant took his rifle and went out to the street. According to the defendant, Calob stopped directly in front of him, began screaming at him, and stated that he was about to pull over so they could settle the matter with a fistfight. The defendant testified that when Calob started to pull over, the defendant took "the barrel end of the gun and nailed [Calob's] car with it, and [Calob] takes off, and that was it." According to the defendant, all of his family was scared, and it all happened fast. The defendant stated, "I've never dealt with someone so irrational to where a child and a woman and a husband, and then a husband with a rifle has asked you to leave and they still will not leave."
An estimator with Owens Collision and Service testified at trial that he looked at the damage to Calob's car door. The estimate for repairing the door was $1,658.88.
ASSIGNMENT OF ERROR NO. 1
In his first assignment of error, the defendant argues that the trial court erred in denying his motion for new trial, in that the trial court refused to consider newly discovered evidence that would have clearly shown Calob was the aggressor in the incident. In his brief, the defendant avers that, after he was arrested, Calob and his mother made social media postings for the purpose of "tarnishing" the defendant's reputation. According to the defendant, they posted several negative comments about the defendant's and his wife's businesses, "incorrect statements regarding [their] criminal history," and "unfavorable statements regarding" their character. According to the defendant, these actions by the defendant after his arrest are consistent with Calob being the aggressor on May 8, 2016.
A defendant seeking a new trial based on newly discovered evidence must demonstrate: (1) that the new evidence was discovered after trial; (2) that failure to discover the evidence before trial was not attributable to the defendant's lack of diligence; (3) that the evidence is material to the issues at trial; and (4) that the evidence is of such a nature that it would probably produce a different verdict in the *604 event of retrial. See La. Code Crim. P. art. 851(B)(3) ; State v. Cavalier , 96-3052 (La. 10/31/97), 701 So.2d 949, 951 (per curiam). See also State v. Prudholm , 446 So.2d 729, 735 (La. 1984). In evaluating whether the newly discovered evidence warrants a new trial, the test to be employed is whether the new evidence is so material that it ought to produce a verdict different from that rendered at trial. See State v. Brown , 522 So.2d 1110, 1118 (La. App. 1st Cir. 1988), writ denied, 548 So.2d 1222 (La. 1989). Furthermore, the trial court's denial of a motion for new trial will not be disturbed absent a clear abuse of discretion. Id.
The trial court did not abuse its discretion in denying the motion for new trial in this case. There is nothing about the defendant's alleged new evidence that would have had anything to do with the completed bench trial. If Calob and his mother did indeed post negative comments about the defendant and the defendant's wife, it was after the incident and would have had no bearing whatsoever on the trial court's determination of whether or not the defendant had acted in self-defense. That is, such postings, if extant, were neither material to the issues at trial nor would they have produced a different verdict in the event of retrial. As the trial court noted in denying the motion for new trial, "All you're saying is basically that the victim allegedly had some attempt to ruin [the defendant's] reputation after the incident."
This assignment of error is without merit.
ASSIGNMENT OF ERRORS 2, 3, and 4
In these three related assignments of error regarding sufficiency of the evidence, the defendant argues, respectively that: (1) the trial court erred in its application of the law regarding justification in finding his actions were not reasonable and apparently necessary to prevent a forcible offense against persons or forcible offense or trespass against property; (2) the trial court erred in finding the defendant's actions on the day of the incident were unreasonable under the circumstances; and (3) there was insufficient evidence to convict him of aggravated assault with a firearm.
A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV ; La. Const. art. I, § 2. The standard of review for the sufficiency of the evidence to uphold a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See also La. Code Crim. P. art. 821(B) ; State v. Ordodi , 2006-0207 (La. 11/29/06), 946 So.2d 654, 660 ; State v. Mussall , 523 So.2d 1305, 1308-09 (La. 1988). The Jackson standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the factfinder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. See State v. Patorno , 2001-2585 (La. App. 1st Cir. 6/21/02), 822 So.2d 141, 144.
Aggravated assault with a firearm is an assault committed with a firearm. La. R.S. 14:37.4(A). A discharge of the firearm is not an element of the offense. State v. Lafleur , 2016-467 (La. App. 3rd Cir. 1/4/17), 209 So.3d 927, 929-30, writ denied, 2017-0808 (La. 1/29/18), 235 So.3d 1104.
The defendant argues in brief that the trial court should have found that Calob *605 was the aggressor in this case. According to the defendant, Calob interrupted his family and harassed and threatened them. Also, according to the defendant, his conduct was in defense of persons or property under circumstances of La. R.S. 14:19 through La. R.S. 14:22. The defendant avers that under La. R.S. 14:19, Calob's "threat of violence" gave him (the defendant) the right to use force or violence against him to protect himself and his property. The defendant suggests that La. R.S. 14:22 (defense of others) is applicable if the defendant's "family members could have acted similarly, and if it was reasonably believed that such intervention was necessary to protect them." According to the defendant, the trial court should have found that, under La. R.S. 14:19, the defendant satisfied both the subjective and objective inquires; that is, under the objective inquiry, the defendant's use of force was reasonable under the circumstances, and under the subjective inquiry, the defendant's use of force was apparently necessary.
Louisiana Revised Statute 14:19 provides in pertinent part:
A. (1) The use of force or violence upon the person of another is justifiable under either of the following circumstances:
(a) When committed for the purpose of preventing a forcible offense against the person or a forcible offense or trespass against property in a person's lawful possession, provided that the force or violence used must be reasonable and apparently necessary to prevent such offense.
Louisiana Revised Statute 14:21 provides:
A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.
Louisiana Revised Statute 14:22 provides:
It is justifiable to use force or violence or to kill in defense of another person when it is reasonably apparent that the person attacked could have justifiably used such means himself, and when it is reasonably believed that such intervention is necessary to protect the other person.
In the non-homicide situation, a claim of self-defense requires a dual inquiry: first, an objective inquiry into whether the force used was reasonable under the circumstances, and, second, a subjective inquiry into whether the force used was apparently necessary. State v. Pizzalato , 93-1415 (La. App. 1st Cir. 10/7/94), 644 So.2d 712, 714, writ denied, 94-2755 (La. 3/10/95), 650 So.2d 1174. In a homicide case, when self-defense is raised as an issue by the defendant, the State must prove, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. State v. Spears , 504 So.2d 974, 978 (La. App. 1st Cir.), writ denied, 507 So.2d 225 (La. 1987). However, Louisiana law is unclear as to who has the burden of proving self-defense in a non-homicide case, and what the burden is. State v. Barnes , 590 So.2d 1298, 1300 (La. App. 1st Cir. 1991).[1] In previous cases dealing with this issue, this court has analyzed the evidence under both standards of review, that is *606 whether the defendant proved self-defense by a preponderance of the evidence or whether the State proved beyond a reasonable doubt that the defendant did not act in self-defense. In this case, we need not and do not decide the issue of who has the burden of proving (or disproving) self-defense because under either standard the evidence sufficiently established that the defendant did not act in self-defense. See Pizzalato , 644 So.2d at 714.
We note initially that La. R.S. 14:22 (defense of others) has no application to this case, and that the defendant's suggestion on how that statute is to be applied to this case is erroneous. Calob attacked no one. The defendant, thus, was not defending someone else from any attack by Calob. We further point out that the defendant's brief, as well the testimony by the defendant and his wife, is wholly at odds with what was captured on the defendant's home surveillance video.
Our review of the video and testimony established the following. It was daytime with fair weather. When Calob pulled into the defendant's side driveway, an iron gate was closed across the driveway. The defendant's son ran to the gate, with arms waving, telling Calob to leave. When Calob pulled in, he immediately pulled out and turned around to go to the store (out of the neighborhood). As Calob drove off, the defendant's daughter then began waving off Calob. The defendant then hurried down his driveway, watching Calob drive away. About forty seconds later (after he first pulled in the driveway), Calob backed up his vehicle on the road and stopped near the driveway. According to Calob he wanted to know what he had done, if anything, and why everyone seemed so upset. When the defendant saw Calob, back up, he ran into his house. Calob tried speaking to Shannon, the defendant's wife, whom Calob could see by the pool, toward the back of the house. Calob, however, could not speak with Shannon because she kept yelling and cursing at him.
Calob drove away and went to the store. Just as Calob drove away, the defendant ran from his house with an AR-15 rifle. The defendant then went out of sight of the camera. About five minutes later, the defendant's stepdaughter pulled into the driveway and parked. She opened the iron gate and went in the house. The iron gate remained open. Forty-five seconds after the defendant's stepdaughter got home, the defendant began walking around his driveway again, with the AR-15 rifle in his hand. The defendant watched Calob turn back into the subdivision (after coming from the store), walked to the edge of his driveway, and flagged down Calob. Calob stopped in the street in front of the defendant's driveway, with his passenger side facing the defendant. It was not clear what was said because the defendant's surveillance video did not have any audio. In any event, Calob sat still for about four seconds, then began to drive away; as he did, the defendant smashed the driver's side door with the muzzle of his AR-15 rifle. Calob stopped again. The defendant walked a few feet to catch up with Calob and aimed his AR-15 rifle at Calob, through the front passenger side window. Calob then drove away.
Shannon testified that Calob yelled at her and the children and exchanged words with the defendant. The defendant testified that Calob's turning around in the driveway and exchanging words with Shannon had everyone shaken and that something like that had never happened before. According to the defendant, when Calob came back from the store, he stopped directly in front of the defendant and started screaming at him. According to the defendant, he felt like he was being bullied, and he was terrified.
*607 Calob, on the other hand, indicated that Shannon was being belligerent and yelling at him and that the defendant was screaming at him and behaving erratically. Calob testified the defendant had a gun in his hand and "seemed like a crazy man." Calob did not have a gun, and, when the defendant pointed the AR-15 rifle at him, Calob feared for his life. When asked on direct examination if he thought the defendant might shoot him, Calob testified: "Definitely. He was foaming at the mouth screaming that day. He looked like a crazy lunatic." Both the defendant and Shannon testified that they did not have any problem with people turning in their driveway. However, it was clear from how the family reacted when Calob pulled in to turn around, that the defendant did not want anyone to use his driveway for that purpose. Detective Roger Oubre, with the Ascension Parish Sheriff's Office, was one of the officers at the defendant's house. Detective Oubre spoke to the defendant, who told the detective that "he was upset and he felt that he was being harassed because people turn around in his driveway all the time."
To Calob, the reactions of the children, the defendant, and Shannon were so excessive and unreasonable when he initially pulled in the driveway, that he thought he had done something - other than pulling in the driveway - to warrant such behavior. When Calob took off, then seconds later backed up to the defendant's house, he wanted to find out what was going on and to try to resolve the conflict before it became worse. Calob feared not only for himself, but for his family, who lived in the same neighborhood. He testified: "this man was screaming and yelling at me for pulling into a driveway. I decided at this moment that he's not right in his head, so I thought he could definitely follow me to my house or show up at my house at some time in the middle of the night and kill me or something. I had no idea."
Accordingly, despite the defendant's assertions in brief, we find nothing in the record before us to suggest that Calob was the aggressor or that the defendant was acting in defense of himself or his property. Except for the few seconds when Calob pulled onto the defendant's driveway, then immediately backed up and drove off in the other direction, Calob was never on the defendant's property. Calob never threatened the defendant, nor threatened his property in anyway. It was the defendant who waited for Calob to come back down the street, flagged Calob down, damaged Calob's vehicle, and pointed an AR-15 rifle at Calob.
Additionally, despite the defendant's claims that he felt threatened and acted out of fear for his and his family's safety, the defendant failed to contact the police after Calob drove away. It was Calob's mother who called the police. Moreover, when the police arrived at the defendant's house, Shannon would not open the iron gate for them, and the defendant would not come outside. Initially, Shannon told the police that she was actually the one who pointed the AR-15 rifle at Calob, and the defendant confirmed Shannon's account of the events. According to Deputy Seth Boudreaux, with the Ascension Parish Sheriff's Office, their seventeen-year-old daughter also told the deputy that Shannon pointed the gun. The defendant admitted at trial that it was his and Shannon's plan to let her go to jail. Only after the police went back to Calob's house, and then returned to the defendant's house to confront the defendant with the inconsistencies, did the defendant confess the truth about him being the one who had the weapon.
None of these actions by the defendant were consistent with someone acting in *608 self-defense, and we find that any rational trier of fact could have concluded beyond a reasonable doubt that the defendant did not act in self-defense. See State v. De Gruy , 2016-0891 (La. App. 4th Cir. 4/5/17), 215 So.3d 723, 733-34, writ denied, 2017-0752 (La. 1/9/18), 231 So.3d 652. Accordingly, we find the force used by the defendant was neither reasonable under the circumstances nor apparently necessary for the protection of anything or anyone. See La. R.S. 14:19(A)(1)(a) ; Pizzalato , 644 So.2d at 714. As the trial court found when adjudicating the defendant guilty of aggravated assault with a firearm:
Aggravated assault with a firearm, the defendant has basically admitted that he's done that. Then the question becomes whether or not he had the right to do that under [the law], which counsel for the defendant has failed to read when he was citing the statute was his actions have to be reasonable under the circumstances, and I don't think there's any question that his actions were totally unreasonable.
Given some of the conflicting testimony, it is not possible to know precisely what words were exchanged between the parties. In any event, the trial court heard all of the testimony, viewed the video evidence, and adjudicated the defendant guilty as charged. The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. The trier of fact's determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a factfinder's determination of guilt. State v. Taylor , 97-2261 (La. App. 1st Cir. 9/25/98), 721 So.2d 929, 932. We are constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases. See State v. Mitchell , 99-3342 (La. 10/17/00), 772 So.2d 78, 83. The fact that the record contains evidence that conflicts with the testimony accepted by a trier of fact does not render the evidence accepted by the trier of fact insufficient. State v. Quinn , 479 So.2d 592, 596 (La. App. 1st Cir. 1985). The testimony of the victim alone is sufficient to prove the elements of the offense. State v. Orgeron , 512 So.2d 467, 469 (La. App. 1st Cir. 1987), writ denied, 519 So.2d 113 (La. 1988).
When a case involves circumstantial evidence and the trier of fact reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. State v. Captville , 448 So.2d 676, 680 (La. 1984). In finding the defendant guilty, it is clear the trial court rejected the theory that Calob was the aggressor, rejected the defendant's theory of self-defense and/or defense of others (and property), and reasonably concluded that the defendant's actions toward Calob were neither reasonable nor necessary under the circumstances. See Captville , 448 So.2d at 680. Further, lying has been recognized as indicative of a defendant's awareness of wrongdoing. Id. at 680, n.4.
After a thorough review of the record, we find that the evidence supports the trial court's finding of guilt. We are convinced that viewing the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that the defendant was guilty of aggravated assault with a firearm. See *609 State v. Calloway , 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam).
These assignments of error are without merit.
CONCLUSION
For the stated reasons, the defendant's convictions and sentences are affirmed.
CONVICTIONS AND SENTENCES AFFIRMED.

In State v. Freeman , 427 So.2d 1161, 1162-63 (La. 1983), the Louisiana Supreme Court, without resolving the issue, suggested that the defendant in a non-homicide case may have the burden of proving self-defense by a preponderance of the evidence. See Barnes , 590 So.2d at 1300-01.