644 So.2d 712 (1994)
STATE of Louisiana
v.
Michael PIZZALATO.
No. 93 KA 1415.
Court of Appeal of Louisiana, First Circuit.
October 7, 1994.
*713 Doug Moreau, Baton Rouge, for State/appellee.
Kevin Monahan, Baton Rouge, for defendant/appellant.
Before CRAIN, FOIL and WHIPPLE, JJ.
CRAIN, Judge.
The defendant, Michael Pizzalato, was charged by bill of information with second degree battery, a violation of La.R.S. 14:34.1. He pled not guilty and expressly waived his right to a trial by jury. After a bench trial, the defendant was found guilty as charged. He subsequently was sentenced to five years imprisonment at hard labor with credit for time served. He has appealed, urging the following assignments of error:
1. The trial court erred in not assigning to the State of Louisiana the burden of proof under La.R.S. 14:19, that Michael Pizzalato did not act with justification in disarming the aggressor, Roy Bain.
2. The trial court's verdict is contrary to the law and evidence.
On July 20, 1991, the defendant, Michael Pizzalato, went to the Scoreboard Lounge in East Baton Rouge Parish. Subsequently, the defendant went into the men's rest room of the lounge and severely beat the victim, Roy Bain, and left him lying on the floor of the men's rest room. Among the injuries *714 sustained by the victim due to the beating were broken ribs, punctured lungs, and broken facial bones. The defendant was arrested on July 23, 1991, when he turned himself in to the police.

ASSIGNMENTS OF ERROR NUMBERS ONE AND TWO:[1]
In his first assignment of error, the defendant contends that the trial court erred in failing to assign to the state the burden of proving that he did not act with justification in disarming the victim, who was the aggressor. The defendant further argues in this assignment of error that he did not have the specific intent necessary under La.R.S. 14:34.1, as he did not intend to commit bodily injury, rather he only intended to disarm the victim. In his second assignment of error, the defendant contends that the trial court's verdict was contrary to the law and evidence presented at trial.
There were no instructions or reasons for the trial court's verdict in the record. It is unclear whether or not the trial judge actually charged himself and/or gave reasons for the verdict. This information was not included in the record. Further, there is no indication in the record and the defendant does not claim that he requested the judge to charge himself. Thus, there is nothing in the record to show what the judge considered in reaching his determination of guilt.
A judge in a bench trial is not required to give reasons in support of his verdict, nor is he required even to charge himself on the applicable law, since he is presumed to know it, unless one of the parties timely requests that he do so and provides him with the requested written charges. See La.C.Cr.P. art. 781; State v. Aldridge, 450 So.2d 1057, 1059 (La.App. 1st Cir.1984). As the trier of fact, the judge is bound simply to apply the law to the facts as established by the evidence and find the defendant not guilty if not convinced of his guilt beyond a reasonable doubt. Id.
La.R.S. 14:19 provides:
The use of force or violence upon the person of another is justifiable, when committed for the purpose of preventing a forcible offense against the person or a forcible offense or trespass against property in a person's lawful possession; provided that the force or violence used must be reasonable and apparently necessary to prevent such offense, and that this article shall not apply where the force or violence results in a homicide.
In the non-homicide situation, a claim of self-defense requires a dual inquiry: first, an objective inquiry into whether the force used was reasonable under the circumstances, and, second, a subjective inquiry into whether the force used was apparently necessary. State v. Navarre, 498 So.2d 249, 252-53 (La.App. 1st Cir.1986).
In a homicide case, the state must prove, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. State v. Spears, 504 So.2d 974, 978 (La.App. 1st Cir.), writ denied, 507 So.2d 225 (La. 1987). However, Louisiana law is unclear as to who has the burden of proving self-defense in a non-homicide case. State v. Willis, 591 So.2d 365, 370 (La.App. 1st Cir.1991), writ denied, 594 So.2d 1316 (La.1992). In previous cases dealing with this issue, this Court has analyzed the evidence under both standards of review, that is whether the defendant proved self-defense by a preponderance of the evidence or whether the state proved beyond a reasonable doubt that the defendant did not act in self-defense. See State v. Navarre, 498 So.2d at 252-53; State v. Aldridge, 450 So.2d at 1059-60. In this case, we need not and do not decide the issue of who has the burden of proving (or disproving) self-defense because under either standard the evidence sufficiently established that the defendant did not act in self-defense.
The evidence reflects two conflicting versions of the incident which occurred between the victim and the defendant. The victim testified that he arrived at the Scoreboard Lounge on July 20, 1991, at approximately *715 5:30 p.m. and sat at the back of the bar. He sat with Donna Rimes and another friend and drank three or four beers. When the victim entered the bar, he saw the defendant but did not recognize him. After the instant incident, he remembered meeting the defendant through a friend six to eight years earlier. The victim did not talk to the defendant while he was at the bar.
After drinking a few beers, the victim went to the rest room. No one was in the rest room when he entered. The victim testified that he urinated in the urinal but did not clearly remember what happened after that. He stated that he was hit, knocked down, and kicked in the ribs. He had just finished urinating and was facing the urinal when the incident took place, so he did not see anyone enter the rest room. He stated that he was semi-conscious after being hit.
The victim did not remember how he was knocked to the floor or what knocked him to the floor, and he did not remember Donna Rimes and Bryan Stephens caring for him after the beating. The next thing he remembered seeing was the "little brown lights" in the ambulance. He did not remember being brought to Earl K. Long Hospital (EKL) or being transferred to another hospital. He was in the intensive care unit when he woke up in the other hospital. The victim testified that he remained in the hospital for fourteen days. He suffered a number of injuries from the beating he sustained, including: broken ribs, punctured lungs, and a broken jaw, cheek bone, and nose.
The victim stated that he did not have a gun at the time of the incident and did not pull a gun on anyone. He testified that he does not and did not own a gun. The victim was unsure why anyone would want to beat him up.
The victim also testified that he did not know that the defendant was married to anyone, nor did he know anything about the defendant's personal relationships. At the time of the incident, the victim was fifty-four years old, 5 feet and 10½ inches tall and weighed approximately 155 pounds.
On cross-examination, the victim testified that he had worked from 7:00 a.m. until 4:30 p.m. on the date of the incident and that the defendant was already in the bar when he arrived. Although admitting that he did not hear well, the victim stated that he did not hear anyone enter the rest room nor did he hear anyone say anything to him before he was hit. He stated that the first hit almost knocked him unconscious. The victim did sustain cuts on his arm during the incident but was unsure how it happened. He admitted to being a regular at the Scoreboard Lounge but stated that he did not go to the bars with topless dancers.
Bryan Stephens testified that he arrived at the Scoreboard Lounge at approximately 4:00 p.m. on the date of the instant offense. The defendant was already in the bar when he arrived; however, the victim was not present. He has known the victim for about fifteen years and has known the defendant for about five years. After entering the bar, Stephens talked to the defendant, shook his hand, and hugged because they were "pretty good friends." The defendant was drinking a beer when Stephens talked to him. Stephens testified that the defendant was with two men whom Stephens did not know, but one of the men was named Ellis.
Subsequently, Stephens observed the defendant pick up Steve Myers, put him down hard on the bar stool, and tell him, "Boy, my hand is bigger than your whole body." Stephens stepped in between the two men and told the defendant that Myers was his friend. The defendant then asked Stephens to go with him to another bar to "bust up the place," but Stephens declined.
Stephens testified that he was playing pool when he saw the victim enter the lounge and sit at the far end of the bar. He did not see the victim and the defendant speak to each other. However, he stated that the defendant was loud and rowdy and that the victim was quiet.
Subsequently, Stephens stopped playing pool because he heard banging coming from the men's rest room which was located near the pool tables. He stated that the noise sounded like a fist fight was occurring in the rest room. When he tried to enter the rest room, the two men to whom the defendant previously had introduced him stopped him. *716 One of the men told him, "I don't think you better go in there." However, after Donna Rimes told Stephens that the victim was in the rest room, they decided to enter the rest room when they saw the defendant leaving. The defendant was dragging his foot and stating the victim had shot him in the back.
Stephens stated that he did not get a good look at the defendant because he was worried about the victim. Upon entering the rest room, Stephens observed the victim lying on the floor with blood around him. The victim was moaning and appeared to be unconscious. Stephens stated that there was a lot of blood in the rest room, but he did not see any guns. Stephens stayed with the victim until he was taken away in an ambulance. The victim did not talk to him.
Stephens testified that he did not hear a gunshot. He did see the defendant leave the bar and get into a car with Ellis. Stephens stated that the defendant was wearing camouflage coveralls and white boots. Stephens did observe that the defendant had some blood on his boots. On cross-examination, Stephens admitted that he did not see what took place in the rest room but he did hear fifteen to twenty banging noises.
Donna Rimes testified that she was working at the Scoreboard Lounge on the date of the instant offense. She saw the defendant and another man with a cane arrive at the lounge sometime between 1:00 and 2:00 p.m. A third person joined the defendant later in the afternoon. She did not know the defendant as that was the first time she had seen him. Rimes testified that she later observed the defendant grab and pull on the bar, hit himself in the face, and become loud.
After her shift ended at 6:00 p.m., she sat down at the bar by the victim. She stated that the victim was very quiet and well behaved. The victim consumed two or three beers but did not appear to be intoxicated. She did not observe the victim and the defendant exchange words with each other, nor did she observe the defendant touch any of the other lounge patrons. Rimes stated that the victim and the defendant sat at opposite ends of the bar.
Rimes stated that she was in the women's rest room when she heard banging and noises coming from the men's rest room. She then saw James Ellis standing near the men's rest room door with his arms folded. Rimes asked Ellis what was going on, and Ellis responded that "his friend was in there just letting off steam."
Rimes testified that she observed the defendant exit the rest room and that his clothes and white boots had blood spattered on them. Upon entering the rest room, she observed the victim lying on the rest room floor, apparently unconscious. She stated that there was a lot of blood, but she did not see a gun anywhere.
On cross-examination, Rimes stated that she remembered hearing the defendant state while he was exiting the bar that he had been shot. She did not know who else entered the rest room besides herself and Stephens.
Anna Badeaux testified that she was working at the Scoreboard Lounge on the date of the instant offense. Upon entering the lounge, she observed the defendant "cutting up" and drinking with two men and a woman. She had not seen the defendant before that day. Badeaux testified that the defendant became belligerent when she refused to serve his friend anymore drinks and told her, "Bitch, you're going to give me a drink." Badeaux refused and told them that they should leave the lounge and that if they did not she would call the police. The defendant then threw a beer at her. She then saw the defendant and his friend proceed toward the back of the bar. She observed the defendant's friend standing outside the door of the rest room. She then heard a loud noise come from the men's rest room, a lot of bangs, and then saw the defendant leave. She stated that the defendant's boots were covered with blood.
Upon entering the men's rest room, she saw the victim lying on the floor covered with blood. She stated that there was blood all over the rest room. She did not see a gun removed from the rest room.
On cross-examination, Badeaux stated the defendant was not wearing camouflage coveralls. She heard a banging noise but not a *717 gunshot. On redirect examination, she stated that the defendant's friend would not let anyone into the rest room.
Doctor Edward Chaisson, who was qualified as an expert in general surgery, testified that he was on call at the Medical Center when the victim was transferred there from EKL where he had been fixed with a chest tube. The victim was conscious when he first saw him, and he had a large amount of swelling. A second chest tube later was placed in the victim because of the partial collapse of a lung. Dr. Chaisson testified that the victim had multiple rib fractures on both his right and left side and that both the victim's lungs had been punctured. The victim had several facial fractures, including the bones outlining both eyes, the zygoma, and some sinus fractures.
The victim was in intensive care for two days. Dr. Chaisson stated that the victim's wounds were consistent with being hit with a blunt object rather than being stabbed with a knife. He also stated that, because of the nature of the victim's injuries, he was either hit or kicked on both sides of the chest. The victim's facial injuries were also consistent with being beaten several times about the face.
The victim's blood alcohol concentration (BAC) was taken at EKL and was determined to be .22%, which Dr. Chaisson stated would be consistent with the defendant having four drinks within an hour to an hour and a half time period.
On cross-examination, Dr. Chaisson stated that the victim did have some marks on his arm which appeared as if "he hit something and then dragged his arm or something like that." He stated that the injuries could have occurred from being slammed against the wall. Dr. Chaisson also stated that the marks on the victim's arm could have occurred from him trying to protect himself with his arm. Dr. Chaisson did not recall any other injury of this type to any other extremity. He also was unable to determine if the victim sustained the injuries while he was lying down or while he was standing up. However, he testified that it was apparent that the victim was hit more than one time. The trauma to the victim was primarily to the upper portion of the body.
On redirect examination, Dr. Chaisson stated that the trauma to the victim appeared to be fairly equal on both sides of the face and that the victim would have to have been hit on both sides of his body in order to puncture both lungs. On recross-examination, Dr. Chaisson admitted that one severe hard blow could fracture a couple of ribs and that the type of injuries that the victim received were consistent with having one's face slammed into a wall or hitting a windshield.
Gary Osberg testified that he worked at the Scoreboard Lounge on the date of the instant offense. When he arrived at the lounge at approximately 12:30, the defendant was at the bar. Subsequently, Badeaux called him inside the bar and told him that there was some trouble in the men's rest room. As he approached it, he saw the defendant exiting the rest room. The defendant told him that he had been shot in the back. Osberg did not see any blood on the defendant's back or anything that appeared to be a bullet wound. However, he did observe blood on the defendant's boots. Osberg saw the defendant get into a car with another man.
After the incident, Osberg cleaned the rest room; he did not find a gun, nor did he see a gun removed from the room. Osberg testified that, approximately one and a half hours after the police finished their investigation, the defendant rode through the parking lot of the lounge in a blue truck. Osberg stated that the defendant had a gun and was holding it outside the window of the truck. Osberg did not see if the defendant got out of the truck because he went into the lounge and locked the door.
Osberg admitted that, when he saw the defendant in the lounge prior to the incident in the rest room, he was not yelling or being loud. Osberg stated that the men's rest room had blood spattered on the urinal, the ceiling, the floor and the hand dryer. He stated that some blood spatters were approximately six feet high and that there was a lot of blood in the rest room.
*718 Steve Myers testified that he was a patron of the Scoreboard Lounge on the date of the instant offense. The defendant was already at the lounge when he arrived in the early afternoon. Myers testified that, at one point, the defendant picked him up and sat him down on the bar stool stating, "Little man, sit there and keep your mouth shut because my hands are bigger than your whole body." Myers also observed the defendant pick up Carol Cox, who was one of Myers' companions, and sit her down on a bar stool. Myers saw the defendant hit himself in the face and slap himself in the mouth. When Myers, Cox, and another companion tried to leave the lounge, the defendant blocked their path for a short period of time.
On cross-examination, Myers admitted that he was not injured by the defendant's actions. He was not present when the incident in the men's rest room took place.
Mark Martello, a Baton Rouge City Police Officer, testified that he arrived at the Scoreboard Lounge at approximately 7:00 p.m. He observed the victim lying face down in the men's rest room with blood covering his face and the rest room floor. The victim appeared to be unconscious. Martello did not see a gun, and none of the lounge patrons turned a gun over to him. Martello returned to the lounge at approximately 9:00 p.m. the same evening because of a report that the defendant had returned to the lounge and was flashing a gun. The defendant had left by the time Martello arrived at the lounge the second time.
Virginia Voss testified that she lived a few blocks off Airline Highway. She called the police to her house at approximately 7:30 p.m. because a man (later identified as the defendant) was at her house claiming that he was hurt. She stated that the man had blood on his boots and was holding his hand which also had blood on it. When Voss let the man talk to the emergency operator, she heard him tell the operator that he had been hit by a car. The defendant was by himself and did not have a car. The defendant left her house before the emergency crew arrived. Voss stated that she was not able to identify the defendant as the man that came to her house because he looked different than he did that night. She stated that if she saw his arms she could identify him, because he had tatoos on them. At that time, the defendant admitted having tatoos on his arms.
Lee Stovall testified that the defendant arrived at her house at approximately 7:45 p.m. on the date of the instant incident. She knew the defendant because he was a friend of her son, Mike. Stovall stated that the defendant was very upset and asked her to help him because he had been shot. Her youngest son, John, called the sheriff's office and asked them to send someone to her house. Stovall observed blood on the defendant's boots but did not see any other blood or any bullet wounds. The defendant told her that three black men and a white woman with red hair were after him and that they were also going to kill Stovall's son, her son's wife, and Stovall's grandchild.
The defendant would not leave Stovall's house with the emergency medical service (EMS) for treatment for his wounds. She stated that he appeared disturbed and distraught. Mike, Stovall's son, finally got the defendant to leave the home. Mike and the defendant left in Mike's blue truck. She stated that the defendant did not have a gun at that time. The defendant did not appear to be sober, but she did not smell alcohol on him. On cross-examination, Stovall admitted that the defendant told her that he had "been shot."
Wayne Griffin, a deputy with the East Baton Rouge Parish Sheriff's Office, testified that he went to Stovall's house. Stovall told him that the defendant told her that he had been shot. Griffin stated that the defendant was disoriented and disheveled. Griffin was unable to determine where the defendant's injury was located, and the defendant refused treatment for his injuries. Griffin testified that he tried to ascertain what happened, but the defendant told him several different stories. Initially, the defendant told Griffin that he had been shot; but, when Griffin asked to see the injury, the defendant changed his story and stated that he had been shot at, but not hit. The defendant later told him that he had been beaten with a baseball bat by three black males and a white female with red hair. The defendant *719 stated that the men were in route to his friend's home, Stovall's son. He also mentioned something about a drug deal. Griffin stated that the defendant's stories did not make any sense. Stovall's son eventually arrived at the scene, and the defendant left with him.
Griffin smelled alcohol on the defendant's breath and observed blood on his boots. He asked the defendant about the blood on his boots, but the defendant could not give him a definitive answer. Griffin testified that the sheriff's office subsequently determined that the defendant was the person involved in the emergency call received from Voss.
Larry Briggs of the East Baton Rouge Parish Sheriff's Office testified that he responded to the call from Voss. The defendant had left before he arrived. He wrote his report as a hit and run based on the information given to him from Voss. The defendant later admitted to him that he had gone to Voss' house and told her that he had been hit by a car. Briggs testified that Voss' house was located near Stovall's house.
Willard Bates of the Baton Rouge City Police Department testified that he went to the Scoreboard Lounge to investigate the instant crime. He arrived at the scene after the victim had been taken away. When he arrived at EKL to see the victim, the victim was conscious. Bates testified that the victim told him that he had gone to the rest room and was beaten by "a big guy" for no reason. Bates also stated that he did not find a gun at the scene, nor did anyone tell him that they had found a gun.
Bates testified that the defendant subsequently turned himself in to the police. The defendant was given his rights; and he gave a statement wherein he stated that he had gone to the rest room at the Scoreboard Lounge where he was confronted by the victim, who made some accusations concerning the defendant's wife, Becky. The defendant told Bates that the accusations were obscene and very offensive to him. The defendant claimed that he had to defend himself because the victim pulled a gun on him. The defendant told Bates that the only thing he did to the victim was ram the victim's head into a wall in order to disarm him. The defendant stated that he left the gun on the floor of the men's rest room. The defendant did not mention anything about drugs being involved.
Bates admitted that he did not record the defendant's statement, write it down, or take notes on his statement. Rather, he stated that he wrote his report four days later from memory.
Becky Pizzalato, the defendant's wife, testified for the defense. She stated that she was in Colorado at the time of the incident. She knew the victim because he went to the bars where she worked as a topless dancer and she used to buy valium from him. She also stated that she might have owed the victim some money. The defendant told her that the victim had called her names in the rest room. She was unable to remember when she talked to the defendant about the incident, but she did not tell the police what the defendant had told her. Becky admitted that she previously was arrested for selling valium; however, upon her arrest, she refused to tell the arresting officer where she got the drugs.
The defendant testified that he played football at L.S.U. for two years. He admitted that he had a previous conviction in Texas of robbery by assault. He went to the Scoreboard Lounge with a friend named Chuck on the date of the instant incident. He stated that he had been there once before, about three years earlier.
After entering the bar, he bought a beer and talked to Stephens. The defendant stated that his friend Ellis came into the bar about one hour after he did. Ellis also was drinking. The defendant testified that a lady asked him to dance, but he did not. He stated that he did hit himself in the neck while he was at the bar because it helps to relieve his pinched nerve. He had been in the bar for two and a half to three hours before he went to the rest room.
The defendant stated that he went to the rest room to urinate; but, when he walked in the rest room, a man (the victim), whom he did not know, was standing at the urinal. The victim subsequently stepped away from the urinal, and the defendant then stepped *720 over to the urinal and began to urinate. The victim walked to the sink area and asked the defendant if his name was Mike, to which the defendant responded that it was. The victim then stated that the defendant's wife was a "rip-off whore." The defendant told the victim that he had not seen his wife in two or three months but that the man needed to talk to her if he had anything to say. The victim then told the defendant that Becky owed him a lot of money and stated, "[S]he ripped me off a bunch of money, and somebody's going to pay." The defendant responded, "Well, its damn sure not going to be me." The victim replied, "Yes, it is."
The victim then pointed a gun at the defendant; however, at that time someone pushed on the rest room door; and, when the victim turned his head, the defendant grabbed his arm. The defendant testified that he yanked the victim's body around the "tank" and did not stop shoving and beating him until the gun "hit the floor." He stated that he hit the victim's arm with which he was holding the gun against the wall and that he kept punching the victim in order to make him drop the gun. The defendant shoved the victim against the wall three or four times. He testified that at some point the victim's face hit the plumbing on the urinal. When the victim finally dropped the gun, the defendant stated that he punched the victim in the face and let him fall to the floor. The defendant then left the bathroom.
He stated that his back was burning, and he believed he had been shot because he thought he heard the gun fire. Ellis grabbed him and told him that they needed to leave because the other patrons of the lounge were cursing at him and might try to shoot him.
The defendant told Ellis that he thought he had been shot. He asked Ellis to take him to Stovall's house, but he went to the wrong house. He admitted that he made up a story to tell Voss because he knew he was at the wrong house and needed to leave. He did tell Stovall that he was hurt but made up the story that he told her because he did not want her to call the police. He did let EMS look at his back, but they did not find any marks. He did not tell them what happened because he was scared.
Stovall's son, Mike, subsequently drove him back to the lounge. There were 8 to 12 people in the parking lot, so they did not drive through the lot, nor did he hold a gun out of the window of the truck while at the parking lot. The defendant subsequently heard that the police were looking for him, so he turned himself in.
The defendant denied going into the bathroom and beating up the victim. He also denied cursing and throwing a beer at Badeaux. He did help a short girl get on her bar stool, but he did not pick up Myers and slam him on his bar stool. The defendant then stated that he might have picked up Myers but that there were "mitigating circumstances." He stated that Myers wanted to arm wrestle, and the defendant did not. Myers kept calling him a "great big galoot." When Myers was returning from the men's rest room, he almost fell; so the defendant caught him, picked him up, and put him on the bar stool. He did not slam him on the bar stool.
The defendant described himself as 6'3" and about 250 pounds. However, he stated that at the time of the incident he weighed about 225 to 230 pounds. The defendant was approximately forty-three years old at the time of the incident. He admitted that he did not call the police and tell them that the victim had pulled a gun on him. He thought that he had been shot but stated that he was "intoxicated" and was not having "rational thoughts."
The defendant did not see where the victim got the gun because he was on the other side of the partition. The defendant stated that he had not talked to the victim all day. The defendant did not tell Bates that the victim demanded the money because Bates did not ask. The defendant denied punching the victim in the ribs; he punched him once in the face after the gun hit the floor. He claimed that one of the victim's friends took the gun out of the rest room.
James Ellis testified that he knew the defendant. When he arrived at the Scoreboard Lounge between 2:00 and 3:00 p.m. on the date of the instant offense, the defendant was already at the bar. They drank together *721 for a while, and he saw the defendant dance with a woman and help a woman onto her bar stool. Ellis testified that he was not asked to leave the lounge and no one refused to serve alcohol to him.
Ellis needed to use the rest room, so he went with the defendant but waited outside because the rest room was small. He heard a loud commotion inside the rest room, so he opened the door. The defendant came to the door, opened it the rest of the way, and stated that he had been shot. There were a lot of people there, so he took the defendant out the back door. He denied that he was standing guard outside the rest room door. He also stated that there were no arguments before the incident in the rest room.
Ellis stated that he did not go into the rest room until the commotion started, and he heard banging as he approached the door. He only opened the door two or three inches, so he did not see what was going on inside the rest room. Ellis did not see anyone pull a gun on the defendant. He also denied blocking the entrance to the rest room. Ellis also admitted to drinking very heavily and being intoxicated at the time of the instant incident.
The standard of review for the sufficiency of evidence to uphold a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude that the state proved the essential elements of the crime beyond a reasonable doubt. See La. C.Cr.P. art. 821; State v. King, 563 So.2d 449, 456 (La.App. 1st Cir.), writ denied, 567 So.2d 610 (La.1990). This Court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. State v. Polkey, 529 So.2d 474, 476 (La.App. 1st Cir.1988), writ denied, 536 So.2d 1233 (La.1989).
The testimony of the victim alone is sufficient to prove the elements of the offense. The trier of fact may accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Johnson, 529 So.2d 466, 473 (La.App. 1st Cir.1988), writ denied, 536 So.2d 1233 (La.1989).
La.R.S. 14:34.1 reads, in pertinent part:
Second degree battery is a battery committed without the consent of the victim when the offender intentionally inflicts serious bodily injury.
For purposes of this article, serious bodily injury means bodily injury which involves unconsciousness, extreme physical pain or protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or a substantial risk of death.
Considering the above testimony, the state clearly proved that the defendant's conduct was not justifiable. A gun was never found, and the victim denied that he ever had a gun or pulled a gun on the defendant. Further, the victim testified that he did not remember who the defendant was until after the incident, did not speak to the defendant or anyone in the rest room prior to the incident, and did not know the defendant's wife. According to testimony of other witnesses, prior to the incident, the defendant had been drinking for a number of hours and was acting in an aggressive manner. After the incident, the defendant fled the scene and made up a number of stories about what happened to him. Upon turning himself in to the police days after the incident, the defendant stated that he only hit the victim once and "rammed his head against the wall." However, at trial the defendant testified that he hit the victim numerous times and shoved him into the wall three or four times. The guilty verdict returned in this case indicates that the trier of fact believed the testimony of the victim and the witnesses for the state and rejected the testimony of the defendant and the defense witnesses. Under these circumstances, we reject the defendant's theory of justification.
The bodily injuries sustained by the victim due to the defendant's actions were so severe that he was placed in the intensive care unit of the hospital. The defendant suffered two punctured lungs and numerous facial fractures. *722 Also, he was unconscious at some point after the incident. Thus, we find that, based on the defendant's actions and the wounds sustained by the victim, the defendant did intentionally inflict serious bodily injury to the victim without his consent.
Consequently, viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have concluded beyond a reasonable doubt that the defendant's conduct was not justified and that he was guilty of second degree battery. These assignments of error are without merit.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] Although in his brief to this Court the defendant separately briefed the two assignments of error, we address them together as the two assignments are related. Additionally, in his brief to this Court, the defendant raised the issue of specific intent in assignment of error number one which should have been argued in his assignment relating to sufficiency.