804 So.2d 932 (2001)
STATE of Louisiana
v.
Thomas WILLIAMS.
No. 2001 KA 0944.
Court of Appeal of Louisiana, First Circuit.
December 28, 2001.
*936 Richard Ieyoub, Attorney General, Baton Rouge, LA, Walter K. Naquin, Jr., District Attorney, Camille A. Morvant, II, Assistant District Attorney, Thibodaux, LA, for appellee, State of Louisiana.
Peggy J. Sullivan, Louisiana Appellate Project, West Monroe, Louisiana, for defendant-appellant, Thomas Williams.
BEFORE: GONZALES, KUHN, and CIACCIO[1], JJ.
*937 KUHN, Judge.
Defendant, Thomas Williams, was charged by grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1. He entered a dual plea of not guilty and not guilty by reason of insanity. Following the appointment of a sanity commission and a sanity hearing, defendant was found competent to stand trial. After a jury trial, he was found guilty as charged, and sentenced to imprisonment for life at hard labor, without benefit of parole. Defendant has now appealed, raising five assignments of error: (1) the evidence was insufficient to support the verdict of second degree murder; (2) the trial court erred in denying defendant's motion for post-verdict judgment of acquittal and motion for new trial: (3); the trial court erred in denying a motion to suppress a tape-recorded statement defendant gave on March 6, 1999; (4) the trial court erred in denying a motion to suppress oral statements defendant made on March 4, 1999; and (5) the trial court erred in refusing to allow defendant to introduce his medical records into evidence at trial.

Facts
On the evening of March 3, 1999, defendant was spending the night with his estranged wife, Regina Williams, at their apartment in Thibodaux, Louisiana. According to defendant, they had been separated for several weeks, but were attempting to reconcile. Defendant also had invited two acquaintances, Joseph Landry and Reginal Cutno, to spend the night in the living room of the apartment. At some point, defendant left the apartment but later returned. Between approximately 3:00-3:30 a.m., Joseph and Reginal were awakened by Regina yelling, "Oh, Mr. Joe, he stabbing me to death." Joseph went to the bedroom and saw the victim sitting in bed, with defendant standing behind her, drinking a beverage. Joseph told defendant, "Man, what is this? You bring me to your house. What is this, you know?" Joseph then walked out of the room, with the victim following him. As he headed to the front door, telling Reginal, "Man, let's get out of here. This man has gone crazy!", he heard the victim collapse and fall to the floor. He and Reginal then rushed out of the apartment.
Outside the apartment, they immediately encountered Latasha Ward, the victim's daughter, and her friend, Rosetta Brown. Latasha lived in an apartment next door, which shared a common wall with her mother's apartment. Latasha and Rosetta had been talking in Latasha's apartment, when they heard the victim screaming for help and for "Tony" (a nickname of defendant) to "stop". Latasha and Rosetta ran to the front door of the victim's apartment, and saw defendant stabbing himself with a black knife as Joseph and Reginal exited the apartment. Latasha beat on the locked door, but was unable to get into the apartment. She finally ran back to her apartment to get her husband, Eric Ward. Eric and Joseph then kicked in the door. At that point, Reginal saw defendant stabbing himself with a knife. Upon entering the apartment, the group found the victim lying on the floor in a pool of blood with defendant lying beside her, about to stab himself again. Eric took the knife away and placed it on the kitchen counter. Defendant told them the victim had stabbed him first.
The police arrived shortly thereafter and attempted to render aid to both the victim and defendant. However, the victim died at the scene from multiple stab wounds. She sustained a total of sixteen stab wounds, primarily in the upper neck and chest area. Five of the stab wounds were potentially lethal; three of those wounds penetrated her heart. The police recovered a black-handled steak knife from the *938 kitchen counter, as well as a knife handle from the bed in the bedroom and a knife blade from the floor beside the bed.
Officer Anthony Reed of the Thibodaux City Police was one of the first officers on the scene. When defendant was taken to the hospital by ambulance, Reed followed in his patrol car and entered the emergency room with defendant. Dr. Vance Broussard was the physician who treated defendant in the emergency room. When he asked defendant what happened, Reed was standing only a few feet away. Defendant replied that he was arguing with the victim when she stabbed him with a knife, and that he then turned around and stabbed her with another knife.
At that point, Reed stepped in, advised defendant of his Miranda rights and asked him what had happened. Defendant said that he was lying in bed sleeping when the victim came in, fussing at him for going out earlier and about her hair. He said the victim picked up a knife that was lying on a dresser and stabbed him in the stomach. According to defendant, he then ran to the kitchen and got a knife, which he used to stab the victim. He stated, "We kept stabbing each other until that dude [Eric Ward] took the knife out of my hand." Shortly after making these statements, defendant was taken into the operating room for exploratory surgery. He had sustained multiple small lacerations on the front of his chest, stomach, and upper abdomen, as well as three wounds on the sides of his neck.
A few days later, on March 6, 1999, Detective Brent Graham went to the hospital to obtain a statement from defendant. After being advised of his Miranda rights, defendant made a tape-recorded statement in which he admitted stabbing the victim, but claimed that she stabbed him first. In this statement, defendant claimed he used a second knife that was on the dresser to stab the victim. He denied inflicting any stab wounds upon himself. Defendant was not under arrest at the time he gave the statement, but subsequently was arrested and indicted for the murder of his wife, Regina.

SUFFICIENCY OF THE EVIDENCE
In his first assignment of error, defendant contends the evidence was insufficient to support the verdict of second degree murder. In his second assignment of error, he argues on the same basis that the trial court erred in denying his motion for post-verdict judgment of acquittal and motion for new trial. Specifically, he asserts the evidence was insufficient to convict him of murder because the preponderance of the evidence established he was insane at the time of the offense and, furthermore, the evidence established he acted in self-defense. Alternatively, defendant argues the evidence was sufficient to support only a verdict of manslaughter, since he and the victim were engaged in an argument at the time of the stabbing.
In Louisiana, a jury considering a defendant's dual plea of not guilty and not guilty by reason of insanity must first determine whether the state has proved the essential elements of the charged offense beyond a reasonable doubt. If the state meets its traditional burden of proof beyond a reasonable doubt, the defendant then bears the burden of establishing that he was insane at the time of the offense and, therefore, exempt from criminal responsibility. See State v. Branch, 99-1484, p. 1 (La.3/17/00), 759 So.2d 31, 32 (per curiam). Following the same procedure herein, we will first determine whether the state's evidence is sufficient to establish the essential elements of second degree murder. If the evidence is sufficient to support the jury's verdict, we will then *939 consider the insanity issue raised by defendant.
The standard of review for the sufficiency of evidence to uphold a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude that the state proved the essential elements of the crime beyond a reasonable doubt. See La.Code Crim.P. art. 821; State v. Pizzalato, 93-1415, p. 17 (La.App. 1st Cir. 10/7/94), 644 So.2d 712, 721, writ denied, 94-2755 (La.3/10/95), 650 So.2d 1174. The Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La.R.S. 15:438 provides the fact finder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. State v. McLean, 525 So.2d 1251, 1255 (La.App. 1st Cir.), writ denied, 532 So.2d 130 (La.1988).
Second degree murder is defined, in pertinent part, by La.R.S. 14:30.1 A(1) as "the killing of a human being ... `[w]hen the offender has a specific intent to kill or to inflict great bodily harm....'" Specific intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). Specific intent need not be proven as a fact and may be inferred from the circumstances present and the actions of the defendant. State v. Carter, 96-0337, p. 3 (La.App. 1st Cir. 11/8/96), 684 So.2d 432, 435. In the instant case, defendant does not deny that he stabbed the victim, or that she died as a result of the wounds he inflicted. He argues instead that he stabbed her in self-defense after she had first stabbed him in the stomach with a knife.
When the defendant in a homicide prosecution claims self-defense, the state must prove beyond a reasonable doubt that the homicide was not committed in self-defense. State v. Bates, 95-1513, p. 9 (La.App. 1st Cir. 11/8/96), 683 So.2d 1370, 1375. La.R.S. 14:20(1) provides that a homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save him from that danger. On appeal, the relevant inquiry is whether or not, after viewing the evidence in the light most favorable to the prosecution, a rational fact finder could have found beyond a reasonable doubt that the defendant did not act in self-defense. State v. Fisher, 95-0430, p. 3 (La.App. 1st Cir. 5/10/96), 673 So.2d 721, 723, writ denied, 96-1412 (La.11/1/96), 681 So.2d 1259.
The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. Bates, 95-1513 at p. 12, 683 So.2d at 1377. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. The trier of fact's determination of the weight to be given evidence is not subject to appellate review. State v. Willis, 591 So.2d 365, 372 (La.App. 1st Cir.1991), writ denied, 594 So.2d 1316 (La.1992). An appellate court will not reweigh the evidence to overturn a fact finder's determination of guilt. Pizzalato, 93-1415 at p. 17, 644 So.2d at 721.
The guilty verdict in this case indicates the jury rejected defendant's claim that he stabbed the victim in self-defense. *940 Viewing the evidence in the light most favorable to the prosecution, we find that it supports the jury's conclusion. Although defendant has asserted repeatedly from the time of the victim's death that he stabbed her only after she first stabbed him in the stomach, and that the wounds he sustained were not self-inflicted, his claim is inconsistent with evidence presented by the state. First, Joseph Landry testified that after being awakened by the victim's shouts, he walked into the bedroom and found defendant standing behind the victim drinking a beverage. Landry stated that defendant did not appear agitated. Based on this evidence, the jury could have concluded that such conduct on defendant's part was not consistent with someone who just had been attacked with a knife. Additionally, while four people heard the victim either screaming that she was being stabbed or calling for help, no one heard defendant call out similarly. Further, although defendant asserted he was stabbed while lying in the bed, the largest bloodstain found on the comforter taken from the bed was consistent with the victim's blood but not with defendant's.
Even more significantly, although defendant claimed in his police statements that he and the victim each had a knife that they used to stab each other, the forensic evidence does not support this claim. In his statement to Officer Reed, defendant specifically stated that the knife on the kitchen counter was the one he used, while the victim used the knife in the bedroom. However, DNA evidence presented by the state indicated that only the victim's blood was found on the knife handle and blade found in the bedroom, which would appear to refute defendant's claim that the victim used that knife to stab him. Moreover, although defendant's blood was found on the blade of the black-handled knife, eyewitness testimony established that knife was taken from defendant's hand after several people saw him stabbing himself. At trial, Reginal Cutno, Latasha Ward, and Rosetta Brown each testified they saw defendant stabbing himself with a knife shortly after the victim's collapse. Further, Dr. Broussard, the physician who examined defendant in the emergency room, opined that his wounds were self-inflicted, since there were no defensive wounds on his arms and the wounds were all quite shallow and very uniform, about the width of a small knife. Dr. Broussard indicated that you would expect to see wounds on someone injured in a struggle that were more random in both location and depth, as opposed to the very uniform pattern of wounds sustained by defendant.
Under these circumstances, the jury reasonably could have rejected defendant's claim that he stabbed the victim in self-defense after she attacked him with a knife. Despite the fact that defendant sustained multiple stab wounds, the state presented overwhelming evidence from which the jury could have concluded those wounds were self-inflicted. The jury obviously rejected the version of events claimed by defendant in his police statements. When all of the evidence is viewed in the light most favorable to the state, we find any rational trier of fact could have concluded beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that the state established each essential element of second degree murder and that defendant did not kill the victim in self-defense.
Alternatively, defendant argues the evidence supports only a verdict of manslaughter because the stabbing occurred during an argument between him and the victim. He asserted in his taped police statement that the victim was frustrated and was fussing at him for going out to a bar that night when he had company staying at the apartment. Thus, he maintains *941 the offense was committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. In support of this contention, he relies on the testimony of Reginal Cutno that he heard the victim and defendant arguing about the victim's jacket and about money sometime prior to hearing the victim yelling that she had been stabbed.
La.R.S. 14:31A(1) defines manslaughter, in pertinent part, as follows:
A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed....
"Sudden passion" and "heat of blood" are not elements of the offense but, rather, are factors in the nature of mitigating circumstances that may reduce the grade of homicide. Moreover, provocation is a question of fact to be determined by the trier of fact. The state does not bear the burden of proving the absence of these mitigating factors beyond a reasonable doubt. Consequently, the issue is whether or not any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigating factors were not established by a preponderance of the evidence. See State v. Johnson, 98-1407, pp. 5-6 (La. App. 1st Cir. 4/1/99), 734 So.2d 800, 804, writ denied, 99-1386 (La.10/1/99), 748 So.2d 439.
In the instant case, the jury reasonably could have found that provocation sufficient to deprive an average person of his self-control and cool reflection was not established by a preponderance of the evidence. Even if the jury accepted defendant's claim that he and the victim were engaged in an argument at the time of the stabbing, the jury could have concluded the argument was insufficient provocation to deprive an average person of his self-control and cool reflection. According to defendant's statement, he was arguing with the victim about going out to a bar while he had company at the apartment. There also was testimony from Reginal Cutno that he heard defendant and the victim arguing about a jacket and about money. However, Reginal further stated that everything then became quiet and he went back to sleep. Regardless, the jury may have concluded that an argument about any of these subjects would not have deprived an average person of his self-control and cool reflection. Given the circumstances, it was not shown by a preponderance of the evidence that the verbal argument constituted sufficient provocation so as to warrant only a verdict of manslaughter herein.
As noted above, provocation is a question of fact to be determined by the trier of fact. See Johnson, 98-1407 at p. 5, 734 So.2d at 804. The jury obviously did not find provocation existed in the instant case. After a careful review of the entire record, we conclude a rational trier of fact, viewing all of the evidence, both direct and circumstantial, in the light most favorable to the prosecution, could have determined beyond a reasonable doubt that defendant was guilty of second degree murder to the exclusion of any reasonable hypothesis of innocence, and that no mitigating factors were established by a preponderance of the evidence.
*942 Having concluded the evidence was sufficient to support the jury's verdict of second degree murder, we must now consider the issue of defendant's sanity. Defendant contends on appeal that the testimony of witnesses who observed his behavior and self-mutilation at the time of the homicide, together with his extensive history of mental illness spanning a period of over twenty-five years, indicates he was in a "period of active psychoses" at the time of the offense. He argues the evidence thus establishes he was insane at the time the victim was killed.
In Louisiana, a legal presumption exists that a defendant is sane and responsible for his actions at the time of an offense. See La.R.S. 15:432; State v. Harris, 99-0820, pp. 6-7 (La.App. 1st Cir. 2/18/00), 754 So.2d 304, 308. Thus, the state is not required to offer any proof of the defendant's sanity. See Harris, 99-0820 at p. 6, 754 So.2d at 308. To rebut the presumption of sanity and avoid criminal responsibility, a defendant has the burden of proving the affirmative defense of insanity by a preponderance of the evidence. See La.Code Crim.P. art. 652. Moreover, criminal responsibility is not negated by the mere existence of a mental disease or defect. To be exempted from criminal responsibility, a defendant must show he suffered a mental disease or mental defect that prevented him from distinguishing between right and wrong with reference to the conduct in question. La. R.S. 14:14; State v. Silman, 95-0154, p. 7 (La.11/27/95), 663 So.2d 27, 32. The determination of sanity is a factual matter. All the evidence, including expert and lay testimony, along with the defendant's conduct and actions before and after the crime, should be reserved for the fact finder to establish whether the defendant has proven by a preponderance of the evidence that he was insane at the time of the offense. See Silman, 95-0154 at p. 7, 663 So.2d at 32.
In reviewing a claim of sufficiency of evidence in regard to a defense of insanity, an appellate court must apply the test set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), to determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the defendant had not proven by a preponderance of the evidence that he was insane at the time of the offense. See Harris, 99-0820 at p. 7, 754 So.2d at 308.
In the present case, defendant presented no medical experts at trial to prove that he was insane at the time of the offense. Instead, he relied primarily on his extensive history of mental illness and serious psychiatric problems, including several episodes of self-mutilation, to establish that he was unable to distinguish between right and wrong at the time of the offense. Defendant presented testimony that he sustained head trauma in a motor vehicle accident when he was approximately thirteen years old, and since that time has been hospitalized fifteen to twenty times for psychiatric treatment. A friend of defendant testified about an incident three years before the homicide when defendant jumped from a car traveling 30-35 m.p.h.; another friend testified that on another occasion approximately twenty-five years ago he had to physically restrain defendant to prevent him from jumping out of a moving vehicle. Defendant's sister and brother-in-law testified that fifteen to twenty years ago they witnessed defendant, who was angry because of an argument he had with some men in the neighborhood, chop his thumb off with a machete. When defendant was in high school, his sister saw him ram his head into a large glass window after he had a *943 fight with another boy as they were getting off a school bus.
In rebuttal, the state presented the testimony of Dr. Rafael Salcedo, an expert in the field of clinical and forensic psychology, who also served on the sanity commission in this case. In addition to meeting with defendant on two occasions, Dr. Salcedo reviewed defendant's extensive medical records and the statement he gave to the police on March 6, 1999. At trial, Dr. Salcedo acknowledged there was no question that defendant had a lengthy history of serious psychiatric problems, which included numerous incidents of self-mutilation and suicide attempts. Although the medical records reflected varying diagnoses of defendant's condition. Dr. Salcedo stated the primary diagnosis was atypical psychosis, (i.e., psychosis not otherwise specified), combined with issues of substance abuse. He further stated that defendant was neither schizophrenic nor retarded.
Despite defendant's psychiatric history, Dr. Salcedo was of the firm opinion that he was able to distinguish between right and wrong at the time he committed the offense in question. Dr. Salcedo noted there was a distinction between the presence of a mental disorder and whether or not a person can distinguish between right and wrong. He further explained that individuals with psychiatric disorders are not continuously psychotic, but that their symptoms tend to wax and wane, as appears to have been the pattern with defendant. In any event, Dr. Salcedo stated a person could even be "actively psychotic and still be able to distinguish right from wrong."
In forming his opinion that defendant was able to distinguish right from wrong at the pertinent time, Dr. Salcedo noted particularly that there was no evidence of psychotic reasoning in the statement defendant gave to the police just two days after the homicide. In fact, he opined that the police statement, in which defendant claimed he acted in self-defense, was lucid and "not consistent with someone who is psychotic, delusional, [or] disordered in their thinking to the degree that they would be unable to distinguish right from wrong." Under questioning by defense counsel, Dr. Salcedo admitted it was possible that someone could be unable to distinguish right from wrong at the time of an offense, and two days later be able to do so. However, he indicated that would be "somewhat unusual", and observed that defendant himself did not claim in the statement that he did not know what he was doing. Rather, defendant explained his conduct on the basis of self-defense.
The state also presented the testimony of Dr. Vance Broussard, who attended defendant in the emergency room, and Officer Anthony Reed, who spoke to defendant in the emergency room shortly after the homicide. Dr. Broussard and Officer Reed each testified that defendant was alert, coherent, and responsive to questions asked of him at that time. Officer Reed further stated that, when advised of his rights, defendant indicated he understood those rights and was willing to talk.
Considering the totality of the evidence, we find that any trier of fact rationally could have concluded that defendant failed to prove by a preponderance of the evidence that he was incapable of distinguishing between right and wrong at the time of the offense. Although evidence was presented at trial of defendant's history of psychiatric problems, no medical expert testified that he was insane at the time of the offense. In contrast, the state presented the testimony of Dr. Salcedo opining that defendant was able to distinguish right from wrong at the pertinent time. Further, Officer Reed testified that defendant was coherent and responsive *944 shortly after the homicide. Finally, we note the fact that defendant repeatedly stabbed himself at the time of the offense can be interpreted as an attempt to bolster his claim of self-defense, as opposed to being a manifestation of insanity. Based on these facts, a rational trier of fact could have found defendant failed to rebut the presumption of sanity by a preponderance of the evidence.
For the above reasons, when all the evidence is viewed in the light most favorable to the state, we find any rational trier of fact could have concluded beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that the state established each essential element of second degree murder, that defendant did not kill the victim in self-defense, and that no mitigating factors were established by a preponderance of the evidence. Moreover, a rational trier of fact could have found defendant failed to rebus, the presumption of sanity by a preponderance of the evidence. Accordingly, the trial court did not err in denying defendant's motions for new trial and post verdict judgment of acquittal.
These assignments of error lack merit.

MOTION TO SUPPRESS STATEMENT OF MARCH 6, 1999
In his third assignment of error, defendant contends the trial court erred in denying his motion to suppress the recorded statement he gave to Detective Graham in the hospital on March 6, 1999. Specifically, he argues he was in no condition to understand his rights or to freely and voluntarily waive those rights, in view of the fact that he was still recuperating from the surgery he had had two days earlier and had been on medication since that time.
It is well settled that for a confession or inculpatory statement to be admissible, the State must affirmatively show it was freely and voluntarily given without influence of fear, duress, intimidation, menaces, threats, inducements, or promises. La.R.S. 15:451; La.Code Crim.P. art. 703. Further, if the statement was elicited during custodial interrogation, the state must show that defendant was advised of his constitutional rights. See State v. Latiolais, 563 So.2d 469, 472 (La.App. 1st Cir.1990). Whether or not a showing of voluntariness has been made is analyzed on a case-by-case basis with regard to the facts and circumstances of each case. The trial court must consider the totality of the circumstances in deciding whether a confession is admissible. State v. Neese, 96-1371, p. 5 (La.App. 1st Cir. 3/27/97), 691 So.2d 291, 294, writ denied, 97-1127 (La.10/17/97), 701 So.2d 1331. Moreover, where conflicting testimony is offered, credibility determinations lie within the sound discretion of the trial judge, and his ruling will not be disturbed unless clearly contrary to the evidence. See State v. Gradley, 97-0641, p. 10 (La.5/19/98), 745 So.2d 1160, 1166. Unless the evidence does not support its findings, an appellate court will defer to the trial court's determination as to whether a confession was made knowingly, intelligently and voluntarily. See State v. Lucky, 96-1687, p. 16 (La.4/13/99), 755 So.2d 845, 855, cert. denied, 529 U.S. 1023, 120 S.Ct. 1429, 146 L.Ed.2d 319 (2000).
The fact that a defendant is suffering from a medical condition does not mean that he is incapable of giving a voluntary statement. One who has suffered a physical injury and is experiencing pain can still be competent to give a free and voluntary confession. See State v. Guidry, 94-678, p. 5 (La.App. 3d Cir.12/7/94), 647 So.2d 502, 506. As in other cases, the critical inquiry is whether the defendant was able to understand the rights explained to him and voluntarily *945 give a statement. See Guidry, 94-678 at p. 5, 647 So.2d at 506.
At the motion to suppress, Detective Brent Graham of the Thibodeaux Police Department testified that, upon arriving at defendant's hospital room in the early afternoon of March 6, 1999, he advised defendant of each of his Miranda rights. Immediately after informing defendant of each right, he asked if defendant understood that right. With one exception, defendant answered in the affirmative. When Detective Graham informed defendant of his right against self-incrimination, defendant asked what that meant. After the detective explained the meaning of the word, defendant said he understood. He also signed a waiver of rights form.
Detective Graham indicated that defendant's answers were responsive, he was not incoherent, and he appeared to be aware of what was happening. Additionally, he testified that no duress, coercion, or threats were used to obtain the statement and no promises were made to defendant. Defendant was not under arrest at the time the statement was given.
Officer Shane Savant, who guarded defendant at the hospital for several hours prior to Detective Graham's arrival, also testified at the suppression hearing. According to Savant, defendant was alert and responsive during this time when questioned by the nursing staff. He said while he read a newspaper, defendant watched a basketball game. Although Savant left the room briefly when Graham arrived, he returned a few minutes later as defendant was signing the waiver of rights form. He was present as defendant gave his statement, which he described as being "like a regular conversation." Savant further testified that defendant was not subjected to any duress or intimidation and that no promises were made to him. Finally, he indicated defendant appeared to understand the questions presented to him and gave detailed, responsive answers to those questions.
Additionally, Dr. Vance Broussard testified that his examination of defendant's medical records revealed no indication that defendant was on any medication that would have made him disoriented or would have affected the free and voluntary nature of his statement. While the records indicated that defendant was on Haldol, Dr. Broussard stated that, if taken in appropriate doses, that drug would not affect one's ability to understand what was going on. He stated that the dose prescribed for defendant was a normal dose. Dr. Broussard further noted that, although defendant initially was given the pain medication, Demerol, his last dose of that medication was on March 5th, the day before the recorded statement. He testified that the effects of that dose lasted approximately eight hours and, therefore, would not have affected defendant at the time of his statement on March 6th.
Finally, defendant testified on his own behalf at the suppression hearing. He stated that while he remembered a detective coming to the hospital to talk to him, he could not remember if the detective advised him of his rights. In fact, defendant said he could not really remember anything after signing the waiver form. He further stated that he just answered yes to everything the detective asked him, and signed the waiver form merely because the detective gave it to him to sign. According to defendant, he did not understand anything that Detective Graham told him, and he did not realize what he was doing. He stated that his "mind comes and goes."
In denying the motion to suppress, the trial court accepted the testimony of the *946 state witnesses, who testified that defendant was alert and responsive at the pertinent time. Based on Dr. Broussard's testimony, the court also concluded defendant was not on any medications that would have affected his ability to understand what was occurring. Furthermore, the court specifically rejected defendant's testimony as not being credible. The court noted in particular that, when Detective Graham used the term "self-incrimination," defendant inquired as to that word's meaning, contradicting his claim that he merely answered yes to everything he was asked without understanding the questions. The court also found defendant's testimony that he did not understand what was going on was further contradicted by his detailed, responsive answers to questions. Finally, the court concluded that the state proved beyond a reasonable doubt that defendant was advised of his Miranda rights, and intelligently and voluntarily waived those rights.
After carefully reviewing the record, we find that it fully supports the trial court's denial of defendant's motion to suppress his recorded statement, and find no reason to overturn that determination.
This assignment of error lacks merit.

MOTION TO SUPPRESS STATEMENTS OF MARCH 4, 1999
In his fourth assignment of error, defendant argues the trial court erred in denying his motion to suppress the statements he made to Dr. Broussard in the emergency room. Specifically, defendant contends the answers he gave in response to questions posed by Dr. Broussard in the emergency room were subject to the physician-patient privilege and, therefore, should have been suppressed.
The record reflects that Officer Reed, in full uniform, followed defendant's ambulance to the hospital and entered the emergency room with him. He was in the examining room, standing five to six feet away, when Dr. Broussard asked defendant what happened. Defendant replied that, during an argument with his wife, she stabbed him, and then he stabbed her. He further indicated two knives were involved.
In denying the motion to suppress, the trial court concluded the statements to Dr. Broussard were not privileged since there was no evidence that defendant, having made the statements in the presence of a police officer, intended to keep the communication confidential. Additionally, the court found the statements were not subject to the physician-patient privilege because defendant's dual plea of not guilty and not guilty by reason of insanity constituted a waiver of the privilege with respect to "evidence relevant to the defendant's sanity at the time of the alleged offense."
La.Code Evid. art. 510 C provides, in pertinent part, as follows:
(1) General rule of privilege in criminal proceedings. In a criminal proceeding, a patient has a privilege to refuse to disclose and to prevent another person from disclosing a confidential communication made for the purpose of advice, diagnosis or treatment of his health condition between or among himself, his representative, and his physician or psychotherapist, and their representatives.
(2) Exceptions. There is no privilege under this Article in a criminal case as to a communication:
(a) When the communication is relevant to an issue of the health condition of the accused in any proceeding in which the accused relies upon the condition as an element of his defense.
Insofar as pertinent herein, article 510 A(8)(a) defines a confidential communication *947 as one involving the transmittal of "information not intended to be disclosed" to persons other than certain delineated individuals involved in a patient's diagnosis and treatment.
On appeal, defendant argues the record does not support the trial court's conclusion that defendant could not have intended his statements to be confidential because he knew Officer Reed was present in the emergency room when he made the statements. However, we note that Officer Reed testified he went into the emergency room with defendant and stood in the examining room only five to six feet away from him while Dr. Broussard spoke to defendant. There also was testimony that defendant was alert and aware of his surroundings at the time. Under these circumstances, the trial court's conclusion appears to be supported by the record.
Nevertheless, even if the trial court erred in this respect, the motion to suppress was properly denied on the alternate basis that, by raising the issue of his sanity at the time of the offense, defendant impliedly waived the physician-patient privilege as to statements he made to Dr. Broussard. See La.Code Evid. art. 510 C(2)(a). These statements, made shortly after the offense, were germane to the issue of defendant's mental condition since they tended to show he was alert, coherent, responsive, and able to give details of the incident at that time. See State v. Berry, 324 So.2d 822, 827-28 (La.1975), cert. denied, 425 U.S. 954, 96 S.Ct. 1731, 48 L.Ed.2d 198 (1976); State v. Aucoin, 362 So.2d 503, 505 (La.1978); State v. Brown, 619 So.2d 692, 695-96 (La.App. 4th Cir. 1993). Moreover, any error in admitting the testimony regarding defendant's responses to Dr. Broussard was harmless error beyond a reasonable doubt in view of the fact that defendant repeated the substance of those responses in subsequent statements he made to both Officer Reed and Detective Graham. See La.Code Crim.P. art. 921.
Defendant further argues in this assignment of error that the subsequent statement he gave to Officer Reed was obtained without a knowing and voluntary waiver of his rights because of his injuries and the fact that he knew the officer already had overheard the statements he made to Dr. Broussard.
In the instant case, Officer Reed testified that once defendant told Dr. Broussard he had stabbed the victim, he stopped defendant and advised him of his Miranda rights. Upon advising defendant of each right, the officer asked whether he understood, and defendant indicated he did. Defendant further indicated he was willing to talk to the officer. He stated that the victim was fussing at him and then picked up a knife and stabbed him in the stomach, as he was lying in bed. Defendant said he ran to the kitchen, grabbed another knife, and stabbed the victim, and that they continued to stab each other until someone took the knife from his hand.
Officer Reed indicated that, despite defendant's injuries, he appeared alert and coherent in the emergency room. According to his testimony, at no time did defendant appear unaware of his surroundings or of what was going on. Furthermore, defendant gave responsive answers when questioned by both Officer Reed and Dr. Broussard. Officer Reed further testified that no one coerced defendant into giving a statement and that no promises or threats were made to him.
At Officer Reed's request, Dr. Broussard remained in the examining room while defendant was being Mirandized and questioned. At trial, Dr. Broussard acknowledged on cross-examination that it *948 was possible a person who had sustained wounds such as defendant's might not have really understood his Miranda rights even if he said he did. However, Dr. Broussard stated that did not appear to be the situation in this case. He further testified that defendant was alert, answered questions appropriately, and appeared to be aware of his surroundings, as well as of what he was being asked. Finally, Dr. Broussard stated that while defendant was in the emergency room, no medications were administered to him that would have affected his ability to understand questions.
In view of the testimony presented, we conclude the trial court's ruling as to voluntariness was supported by the evidence, despite defendant's physical condition at the time of the statement. The state met its burden of affirmatively showing the statement was given to Officer Reed freely and voluntarily after defendant was fully advised of his rights. Accordingly, the trial court did not err in denying defendant's motion to suppress these statements. This assignment of error lacks merit.

MEDICAL RECORDS
In his fifth assignment of error, defendant contends the trial court erred in refusing to admit certain medical records pertaining to his long history of psychiatric disorders, since an issue was raised at trial as to his sanity. He maintains the erroneous exclusion of these records impinged on his constitutional right to present a defense and, therefore, is not subject to harmless error analysis.
The record reveals that, during the presentation of defendant's case-in-chief, defense counsel moved to introduce a number of medical records in order to meet defendant's burden of rebutting the legal presumption of sanity. The state objected on the basis of relevancy, arguing the records did not establish whether defendant knew right from wrong at the pertinent time. The trial court opined that the records potentially were relevant, but nevertheless sustained the objection for the following reasons:
Without any medical expert present to in some way aid the finder of fact in interpreting these medical records, they are of no use whatsoever in my opinion to the Jury, in fact, very well could be misleading to the Jury.
As an example, the very first impression the medical record says depression and substance abuse. The finder of fact may be confused and belief [sic] that depression in and of itself is some proof of an inability to distinguish right from wrong.
* * * * *
This Court concludes that any probative value these records may have is substantially outweighed by the possibility of misleading the Jury. Without an expert present to give some interpretation of what these medical terms of art mean, they mean nothing to a lay finder of fact.
After proffering the medical records in question, defense counsel proceeded to introduce testimony from several of defendant's family members and friends regarding his bizarre and destructive behavior, including several incidents of self-mutilation, as well as his extensive history of psychiatric treatment. As noted earlier, the state then called Dr. Rafael Salcedo on rebuttal. Since Dr. Salcedo had reviewed the proffered medical records in evaluating defendant, the trial court ruled defense counsel was entitled to use those records in cross-examining Dr. Salcedo, and could "request that they be admitted into evidence" at that point. In accordance with this ruling, defense counsel utilized *949 the medical records throughout cross-examination, questioning Dr. Salcedo extensively on information contained therein, including various diagnoses rendered and medications prescribed, as well as specific incidents of self-mutilation, attempted suicides, and self-destructive conduct. Although defense counsel went so far as to mark for identification the previously proffered records as defense exhibits one to six, the record indicates he did not re-offer the exhibits to be introduced into evidence.
A criminal defendant has a constitutional right to present a defense. U.S. Const.Amend. 6; La. Const. art. 1, § 16; State v. Cosey, 97-2020, p. 13 (La.11/28/00), 779 So.2d 675, 684, cert. denied, 533 U.S. 907, 121 S.Ct. 2252, 150 L.Ed.2d 239 (2001). Moreover, all relevant evidence is admissible, except as otherwise provided by law. La.Code Evid. art. 402. La.Code Evid. art. 401 provides that "relevant evidence" is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, risk of misleading the jury, or by considerations of undue delay, or waste of time. La.Code Evid. art. 403. In questions of relevancy, much discretion is vested in the trial court. Ultimately, questions of relevancy and admissibility are discretion calls for the trial court, and its determinations regarding relevancy and admissibility should not be overturned absent a clear abuse of discretion. State v. Duncan, 98-1730, p. 10 (La.App. 1st Cir. 6/25/99), 738 So.2d 706, 712-13.
In the instant case, the trial court arguably acted within its discretion in excluding defendant's psychiatric records since defendant was unprepared to offer any expert testimony to assist the jury in understanding those records. As noted by the trial court, the records were replete with medical terminology and references that, without some explanation, may have confused or misled the jury. See La.Code Evid. art. 403. Nevertheless, whether or not the ruling was erroneous, we find any such error was harmless beyond a reasonable doubt.[2] First, during cross-examination of Dr. Salcedo, the trial court advised defense counsel that he could request that the documents be admitted, presumably because an expert witness was available at that point to assist the jury in understanding them. Yet, defense counsel failed to re-offer the documents for admission into evidence. Moreover while the jury did not view the medical records themselves, Dr. Salcedo was cross-examined at length upon the specific contents of the proffered medical records, to the extent that the jury was fully informed of their essential import. See State v. Stovall, 363 So.2d 658, 659 (La.1978). Under these circumstances, defendant clearly was not prejudiced by the exclusion of the proffered medical records. See La.Code Crim.P. art. 921. This assignment of error is meritless.
For the reasons assigned, defendant's conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] The Honorable Philip C. Ciaccio, Judge (retired), Fourth Circuit Court of Appeal, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] Contrary to defendant's assertion, we believe the exclusion of the medical records, if error, was a trial error subject to harmless-error analysis on appeal, as opposed to a structural error not subject to such review. See State v. Johnson, 94-1379, pp. 14-15 (La.11/27/95), 664 So.2d 94, 100-101.