CRAIN, J.
|2The defendant, Joan Faye Hartman, was indicted for the second-degree murder of Tanya Carolina Knower. See La. R.S. 14:30.1. A jury found the defendant guilty of manslaughter, and the trial court sentenced her to thirty-five years imprisonment at hard labor. See La. R.S. 14:31; La.Code Crim. Pro. art. 814. The defendant appeals arguing that the State failed to prove she did not act in self-defense, that the trial court improperly instructed the jury, and that the sentence imposed is excessive. We affirm the defendant’s conviction and sentence.
FACTS AND PROCEDURAL HISTORY
On July 15, 2012, the fifty-four-year-old defendant fatally stabbed twenty-seven-year-old Tanya. Tanya was in a relationship with the defendant’s son, Richard, and was the mother of his two daughters, all of whom lived in a small home with the defendant and the defendant’s wheelchair-bound husband. The relationship between the defendant and Tanya was contentious and, at times, volatile. The defendant believed that Tanya neglected her children and family, and also abused drugs. On the night of the crime, the defendant and Tanya argued, and Tanya threatened to move out of the home with the children and never let the defendant see them again. The argument escalated to a physical confrontation, with the defendant ultimately stabbing Tanya twice, first in the back, and then in the stomach.
At trial, the defendant admitted that she killed Tanya, but claimed shp acted in self-defense. The jury rejected the defendant’s defense and found her guilty of manslaughter, which is a homicide that would be either first-degree murder or second-degree murder, but is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. See La. R.S. 14:31(A)(1).
| aSELF-DEFENSE
The defendant argues that the evidence at trial is insufficient to support a conviction of manslaughter because the State failed to prove that she did not act in self-defense. The defense contended that the defendant was the primary caregiver for everyone in the family, despite her heart condition, and did her best to keep her family together. However, the defense contended that Richard was an ungrateful liar who abused the defendant, and Tanya was “[wjhacked out” on Xanax and was “the root of every last bit of evil in [the defendant’s] life.” The defense asserted that the defendant bought a knife for her own protection because she feared that Tanya would kill her, maintaining that Tanya had stabbed her before and repeatedly threatened to do so again. The defense argued that on the night of the crime the defendant reasonably believed that Tanya was under the influence of *461 Xanax and was going to stab her, so the defendant was justified in retrieving her knife and defending her own life. While two knives were found at the crime scene, one brown-handled and one black-handled, the evidence at trial revealed that Tanya’s wounds were caused by the brown-handled knife. The defense argued that the logical explanation for the presence of the black-handled knife is that Tanya was' armed with it and intended to kill the defendant.
A homicide is justifiable when committed in self-defense by one who reasonably believes that she is in imminent danger of losing her life or receiving great bodily harm and that the killing is necessary to save herself from that danger. La. R.S. 14:20(A)(1). However, a person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless she withdraws from the conflict in good faith and in such a manner that her adversary knows or should know that she desires to withdraw and discontinue the conflict. La. R.S. 14:21, When the defendant in a homicide Rprosecution claims self-defense, the State must prove beyond a reasonable doubt that the homicide was not committed in self-defense. State v. Williams, 01-0944 (La.App. 1 Cir. 12/28/01), 804 So.2d 932, 939, writ denied, 02-0399 (La.2/14/03), 836 So.2d 135.
In reviewing claims challenging the sufficiency of the evidence, this court must consider whether, after viewing the evidence in the light most' favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); see also La.Code Crim. Pro. art. 821(B); State v. Ordodi, 06-0207 (La.11/29/06), 946 So.2d 654, 660; State v. Mussall, 523 So.2d 1305, 1308-09 (La.1988). Regarding the defendant’s claim that she acted in self-defense, the relevant inquiry on appeal is whether, after viewing the evidence in the light most favorable to the prosecution, a rational factfinder could have found beyond a reasonable doubt that the defendant did not act in self-defense. Williams, 804 So.2d at 939.
As part of the evidence against the •defendant, the .State presented the defendant’s recorded interview with St. Tammany Parish Sheriff’s officers conducted hours after the crime. During most of the interview, the defendant was unaware that Tanya died frqm her injuries, and she repeatedly stated she hoped Tanya would die and that she preferred to go to jail for murder rather than attempted murder. The defendant said, “I hate her guts and I want her dead ... Bitch should be dead.”
During the interview, the defendant voiced numerous complaints against Tanya, including her failure to properly care for the children’s medical needs and Tanya’s threat to remove the children. She described Tanya as constantly “pushing” her. The defendant also told the officers that Tanya ^stabbed her approximately eight years previous, but the defendant lied about the source of her injuries then to protect Tanya for the children’s sake, noting that Tanya never thanked her. The defendant also indicated that Tanya frequently threatened to stab her again. She stated that the children deserved a better mother and that Tanya was “better dead.” The defendant complained about Tanya’s abuse of Xanax and reiterated that she hoped Tanya died. She told the officers “you can just push someone so far until someone says that’s enough .... I been pushed for f-years.” The defendant said that Tanya “[put her] through hell.”
Regarding the events of the evening of the crime, the defendant described arguing with Tanya then going for a walk to calm things down after Tanya called her names *462 and spit in her face. Upon returning, the defendant found that Tanya had removed all of the children’s drawings and pictures from the walls. The defendant was infuriated, describing Tanya’s action as “just mean.” The two then argued, and Tanya threatened to take the children away and never allow the defendant to see them. The defendant described Richard separating a physical confrontation, then the defendant going to retrieve her knife from her bedroom closet. The defendant explained that a month prior, she had purchased the knife to use against Tanya and intended to kill Tanya then, but was convinced otherwise by the defendant’s sister.
The defendant explained that after she retrieved her knife, she encountered Tanya and stabbed Tanya in the back as Tanya turned away. She said she told Tanya, “this is how it feels,” referring to the time Tanya stabbed her. The defendant went on to explain that she stabbed Tanya in the abdomen as Tanya lay on the floor because- Tanya was still moving and that “pissed [her] off.” The defendant indicated she would have stabbed Tanya again, but Richard prevented her. When asked where she got the second (black-handled) Inknife, the defendant did not know what knife the officers were talking about, but then recollected that she might have gone into the kitchen to get another knife. The defendant did not, at any time, describe seeing Tanya with a knife, and, in fact, stated that no one else was in possession of a knife.
The defendant repeatedly expressed that she believed Tanya would survive and how unhappy she was about that, stating she had intended to kill Tanya. When she was finally told Tanya died from her injuries, the defendant calmly stated, “Thank you God.” She went on, “She’s really dead? ... Good. I’m very happy ... You don’t know how happy I am. I was pissed she was alive.” The defendant further indicated, she knew Tanya’s family would care for the children. She told them she did not care that she was being charged with second-degree murder and she knew she deserved to spend the rest of her life in prison or to be put to death. .
Corporal John Evans with the St. Tammany' Parish Sheriffs Office was the first to respond to the scene of the crime and testified that he found the defendant in the living room, enraged, and shouting “I hope you die, bitch.” Tanya’s body was lying on the floor with a visible stab wound. The defendant continued to scream as she was placed under arrest and • advised of her Miranda rights.[1] Deputy Jordan Holand-beck placed the defendant into a police unit as she continued shouting obscenities, while admitting to stabbing Tanya. According to Corporal Evans’ notes, the defendant stated, “I stabbed that bitch. Shoot- her. if she ain’t dead ... I bought that knife from Wal-Mart a month ago specifically to stab her in the back.” Deputy Holandbeck also recalled in his testimony the defendant claiming Tanya previously stabbed her in the back.
|7The defendant’s son, Richard, testified that he witnessed the crime. He described telling the defendant earlier in the day that he had a job prospect in Colorado, and the defendant becoming belligerent and stating she wished he had never been bom. He indicated that the defendant then began arguing with Tanya. Richard testified that as two dominant females in the same home, the defendant and Tanya sometimes “dashed.” He described Tanya as nonabusive, but stated she- “wouldn’t take no slack” and would stand up for herself when necessary. He also confirmed that Tanya had been pre *463 scribed Xanax for health issues and took it before, going to sleep.
Richard testified that approximately two hours prior to the crime, the defendant took a walk, which was something she typically did to calm down when angered. After she returned, and about an .hour before the crime, Richard had to physically separate the two women when- the defendant began striking Tanya after Tanya threatened to leave with the children.
Richard testified that after breaking up the “little shoving match,” he went back to a living 'room where he played video games, and the defendant walked toward her room. Shortly thereafter he heard another scuffle and saw the two women fighting again. He testified that he separated them and, as he turned away, he saw the defendant pull an object out of her sweatpants and stab Tanya in the back as Tanya walked away. Richard testified he removed the knife from Tanya’s back, then saw the defendant return with, “another knife” she used to stab Tanya in the.stomach as Tanya was on the floor. He described the defendant standing over Tanya’s body, cursing and saying, “I wish you would die.” Richard testified that he called 911 and held the defendant against a wall to prevent her from stabbing Tanya or himself.
When questioned about the defendant’s claim that Tanya previously stabbed her, Richard responded:
| SI heard two sides of that story. I was not there for it. So I’m not going to speculate on it. I heard her side, and I heard Tanya’s side ... As far as I know, she fell on the table and was cut with glass. What she told me. That’s what she told the doctor. And later on, she told me Tanya stabbed her.
Richard also described the defendant as being notorious for making up stories, Richard denied seeing Tanya with a knife at any time during her confrontation with the defendant. .
Photographs of the crime scene taken by a St. Tammany Parish Sheriffs Office crime scene technician show both a brown-hhndled and a black-handled knife. Richard recalléd seeing both a brown-handled and black-handled knife, and, when asked about the location where they were recovered, he answered, “[a]s far as I know, I threw them.” He added, “[i]t happened so quick.” Richard explained that after the defendant stabbed Tanya in the back, the defendant ran to the kitchen and grabbed the second knife. A block of black-handled knives was found on the kitchen counter, ; with others found in the sink that matched the one shown in the photos. The brownhandled knife had suspected blood and fecal matter on it and, at the scene, tested positive for presumptive blood. The black-handled knife had negative test results.
St. Tammany Parish’s chief deputy coroner, Dr. Michael DeFatta, performed the autopsy on Tanya’s body and testified as an expert in the field of forensic pathology. He noted that Tanya suffered facial injuries, including bruising below the right eye and scratch marks on her right cheek and around her nose. He described the two stab wounds, explaining there was virtually no bleeding associated with the abdominal wound, which indicated that it occurred during or just after the time of death, when Tanya’s heart was not beating sufficient to supply blood to her body’s tissues. Dr. DeFatta testified that the stab wounds were, similar, as if inflicted by the same sized, blade, and 19were consistent with wounds that could have been produced by the brownhapdled knife. He further confirmed that some fecal matter would have been found on the knife used to stab Tanya in the abdomen.
*464 Dr. DeFatta additionally confirmed that Tanya had benzodiazepines in her system, a common form being Xanax. When questioned about the risk of taking the drug in excess, Dr. DeFatta acknowledged that there were documented cases of frontal lobe brain trauma, which could change someone’s personality from mild-mannered to violent. However, the expert forensic toxicologist for the St. Tammany Parish coroner’s office testified that the benzo-diazepine level in Tanya’s system was a therapeutic level consistent with normal usage as a sleep aid, which would have produced the intended antianxiety effect.
As part of her defense, the defendant attempted to discredit Richard’s testimony by showing that he was untruthful. The defense argued that Richard could not possibly have seen the crime as he described and could not have seen that Tanya did not go into the kitchen and retrieve the black-handled knife. The defendant also presented the testimony of her sister, Margaret Jones, who testified about Richard abusing the defendant, confirmed by evidence of Richard’s criminal history, which Richard had denied. The defense urged the jury to disregard all of Richard’s testimony based on his lies about the knife and his abuse of the defendant.
Jones additionally testified that the defendant was the main caregiver for her husband and the children. Jones stated that Tanya called her the night before the crime, describing a fight with the defendant that resulted in the defendant leaving on foot. According to Jones, Tanya refused Jones’ request to pick up the defendant and told her “I hope she gets run over and killed.” Jones further testified that when she suggested that Tanya leave before the Imdefendant returned, Tanya stated, “I’m not scared of that bitch.” Jones denied being told by the defendant that she purchased the knife, but indicated she learned from another sister that the defendant purchased the knife to defend herself.
The defendant also testified. She described being “furious” and that her “adrenaline was pumping” when she stabbed Tanya. The defendant claimed that approximately a month prior to the crime, she saw a Facebook message where Tanya was asked if she had stabbed the defendant again lately, with Tanya’s response being, “No. I think I’ll run that bitch over with my car.” The defendant also claimed that Tanya repeatedly threatened to stab her again. The defendant admitted she bought the knife she used to kill Tanya approximately a month prior to the crime and kept it in her closet.
The defendant denied having the intent to stab Tanya upon returning home after her walk, but claimed Tanya, who was agitated as a result of taking Xanax, was still “boiling” and “got right in my face.” Upon exchanging words about the removal of the children’s artwork, the defendant claimed she went from “zero to 900.” She claims Tanya then punched her and Richard held her by her neck and spat in her face. She described having difficulty breathing and telling them she could not fight them both. Further argument with Tanya over the children involved threats to call the authorities. The defendant described being “eye to eye” with Tanya as Tanya said, “Dead.” The defendant claimed that Tanya had the same look on her face as the previous time she stabbed the defendant, leading the defendant to retrieve her brownhandled knife from the bedroom closet.
The defendant testified that the stabbing happened in seconds while her adrenaline was up, stating, “Tanya was coming. And Tanya looked at me. She turned her back. I didn’t care where I stabbed her. I stabbed her. Tanya_J_ywalked three *465 steps. I’m thinking, ‘Shit. She’s' not dead. She’s not bleeding. This doesn’t work.’ And [Tanya] turned. And. she fell.” The defendant contradicted Richard’s testimony that he pulled the knife from Tanya’s back, testifying that she never let go of the knife. The defendant described Tanya walking away after being stabbed in the back and thinking, “Oh, crap. She’s going to kill me ... She’s going to get better, and that bitch is going to kill me.” ¡The defendant denied any knowledge of the black-handled knife, but after being pressed by defense counsel, speculated that Tanya must have brought it there, again stating that she stabbed Tanya twice with the brownhandled knife. The defendant testified, “It was me or her. I knew that. I knew it ... Tanya [didn’t] make idle threats when she [was] on Xanax.”
The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. Moreover, where there- is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the wéight given the evidence, not its sufficiency. The trier' of fact’s determination of the weight to be given evidence is not subject to appellate review. Thus, an appellate court will not reweigh the evidence to overturn a'fact finder’s determination of guilt. State v. Taylor, 97-2261 (La.App. 1 Cir. 9/25/98), 721 So.2d 929, 932. Further, when a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defendant’s own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. State v. Captville, 448 So.2d 676, 680 (La.1984); Taylor, 721 So.2d at 932.
The guilty verdict in this case indicates that the jury rejected the defendant’s contention that she feared for her own life and stabbed Tanya in self-defense. An appellate court errs by substituting its appreciation of the 119evidence and credibility of witnesses for that of the fact finder and overturning . a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. State v. Calloway, 07-2306 (La.1/21/09), So.3d 417, 418 (per curiam). We conclude that a rational juror could have found that the State established beyond a reasonable doubt that the defendant did not act in self-defense. See Ordodi, 946 So.2d at 662. This assignment of error is without merit.[2]
JURY INSTRUCTION
'The defendant additionally claims the trial court committed reversible error in failing to fully instruct the jury during deliberations as to all responsive verdicts when the jury requested the definition of all possible verdicts in writing. The defendant complains that the trial court implied to the jury that the only possible verdicts were guilty verdicts.
In response to the.jury’s request, the trial court re-read the lengthy instructions defining the responsive verdicts to the charged crime of second degree murder, including guilty of second degree murder, guilty of manslaughter, guilty of negligent homicide, not guilty, and not guilty by reason of insanity.[3] The trial court specifi *466 cally instructed the. jury that they must find the .defendant not guilty if. they did not find beyond a reasonable doubt, that the defendant committed the offense charged, or an offense responsive thereto.
We find no merit to the defendant’s argument. The trial court is required to charge the jury as to the law applicable to the case, and jury | ^instructions are analyzed.-to test whether, taking the instruction as a whole, a reasonable person of ordinary intelligence would understand the charge. See La.Code Grim. Pro. Art. 802; State v. West, 568 So.2d 1019, 1028 (La.1990). The trial court’s original instructions covered self-defense and the aggressor doctrine. Further, the trial court’s reinstruction complied with the agreement of the parties to respond to the jury’s request by re-reading the list of responsive verdicts to the jury. The reinstruction was adequate and, taken as a whole, the instructions clearly set forth all verdicts such that a reasonable person of ordinary intelligence would understand.
EXCESSIVE SENTENCE
The defendant argues the. thirty-five year sentence imposed is- equivalent to a life sentence, and is excessive and constitutes cruel and unusual punishment. In support of her argument, she contends that the trial court failed to consider mitigating factors such as testimony by an expert forensic psychologist that she is unlikely to, reoffend, her failing health, the non-unanimous verdict (ten agreed), and evidence that" the crime was committed after “strong provocation.” ';
Article I, Section 20 of the Louisiana Constitution prohibits the imposition of excessive punishment. Although a sentence may be within statutory limits; it may violate a defendant’s constitutional right against excessive punishment and is subject to appellate review. State v. Sepulvado, 367 So.2d 762, 767 (La.1979). A sentence is unconstitutionally excessive if it. is grossly disproportionate to the severity of the offense or is nothing more than a purposeless and heedless infliction of pain and suffering. See State v. Hurst, 99-2868 (La.App. 1 Cir. 10/3/00), 797 So.2d 75, 83, writ denied, 00-3053 (La.10/5/01), 798 So.2d 962. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to [^society, it shocks the sense of justice. State v. Hogan, 480 So.2d 288, 291 (La.1985). The sentence imposed will not be set aside absent a showing of manifest abuse of the trial court’s wide discretion to sentence within statutory limits. State v. Lobato, 603 So.2d 739, 751 (La.1992).
The Louisiana Code of Criminal Procedure sets forth items that must be considered by the trial court before imposing sentence. La.Code. Crim. Pro. art. 894.1. The trial court need not recite the entire checklist of Article 894.1, but the record must reflect that it adequately considered the guidelines. State v. Herrin, 562 So.2d 1, 11 (La.App. 1 Cir.), writ denied, 565 So.2d 942 (La.1990). In-light of the criteria expressed by Article 894.1, a review for individual.excessiveness should consider the circumstances of the crime and the trial court’s stated reasons and factual basis for its sentencing decision. State v. Watkins, 532 So.2d 1182, 1186 (La.App. 1 Cir.1988). Remand for full compliance with Article 894.1 is unnecessary when a sufficient factual basis for the sentence is shown. See State v. Lanclos, 419 So.2d 475, 478 (La.1982).
The trial court imposed the defendant’s sentence after considering victim impact statements from Tanya’s mother and stepfather regarding the effect of Tanya’s death on her children, testimony on behalf of the defense by a Bible study *467 teacher from the St. Tammany Parish jail and. a local pastor, and testimony by experts in forensic psychiatry regarding the defendant’s remorsefulness and probable rehabilitation, as well as possible effects of the Xanax in Tanya’s system at the time of the crime. The defendant also offered additional testimony that she believed she was in danger when she killed Tanya. The trial court noted the defendant’s" lack of prior criminal history, the volatile relationship betwéen the defendant and Tanya, as well as the traumatic effect of the crime on Tanya’s children. The trial court’ concluded that the 11ficase consisted "of “the worst acts,” and manifésted deliberate cruelty by the defendant to Tanya. The trial court opined that any lesser sentence would , deprecate the seriousness of the offense.
We find that the trial court adequately considered the relevant statutory guidelines, includihg mitigating and aggravating factors, before imposing sentence. The sentence is not grossly disproportionate to the severity of the offense or shocking to the sense of justice, and is amply justified by the record. Accordingly, the sentence is not constitutionally excessive and this assignment of error lacks merit;
CONVICTION AND SENTENCE AFFIRMED.

. Miranda v. Arizona, 384 U.S. 436, 444-45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).

. The defendant solely challenges the manslaughter conviction on grounds that she.acted in self-defense, and does not otherwise challenge the sufficiency of the evidence supporting the conviction.

. The defendant changed her plea to not guilty by reason of insanity after she was found competent to proceed to trial. The defendant has not raised any issues regarding the jury’s rejection of her insanity defense.